UNITED STATES TRUST CO. v. WESTERN CONTRACT CO. ECHOLS
et al. v. CENTRAL TRUST CO. OF NEW YORK. WESTERN CON-
TRACT CO. v. ECHOLS et al. BROWN et al. v. WESTERN CON-
TRACT CO.[1]

(Circuit Court of Appeals, Sixth Circuit. May 24, 1897.)

Nos. 445–448.

1. RAILROADS—CONTROLLED LINES—ADVANCES.

When one railroad company assumes the management of another, all
the earnings of both being deposited in a common fund, from which all the
expenses of both are paid, book entries being made to show how much is
received from and how much expended for the latter road, the former is
not a supplier of materials or contractor with the latter, so as to be en-
titled to a lien upon the property of the latter for the amount expended
for it, over and above the amount received from it, but any such excess
is only an advance of money.

2. RAILROAD FORECLOSURES—INTERVENTIONS—PROCEDURE.

When an intervening petition is filed in a foreclosure suit, asserting a lien
superior to that of the mortgage, it is not error, if the intervener is found
to have no lien, to dismiss the petition without awarding him a money
judgment.

8. RAILROADS—CONTROLLED LINES—GUARANTIES AND ADVANCES.

The W. Co., which held a large amount of the stock and bonds of the
V. Ry. Co., entered into a contract with the C. Ry. Co. by which it was
agreed that the W. Co. should deliver to the C. Co. 60 per cent. of the stock
of the V. Co., which was at once to be deposited with a trustee to secure
the performance of the agreement, and to be returned to the W. Co. on
nonperformance; and the C. Co. agreed to guaranty for seven years the
principal and interest of the V. Co. bonds. The W. Co. guarantied that the
floating debt and Car Trust obligations of the V. Co. should not exceed
certain sums, and provided for the payment of these debts by deposit-
ing with a trustee like sums in bonds, which might be sold by the
C. Co., and used to pay the V. Co.'s debts or reimburse the C. Co.
for any moneys advanced for that purpose. The stock and bonds were
deposited, and the C. Co. continued to pay the interest on the V. Co.
bonds, under its guaranty, for some years, but before the expiration
of the seven years the C. Co. passed into the hands of receivers, and
ceased paying, whereupon the W. Co. demanded and received back
the stock of the V. Co. Subsequently the receivers of the C. Co. as-
serted a claim against the bonds deposited as security for the floating debt
and Car Trust obligations of the V. Co., due at the time of the contract,
for the amounts of the V. Co.'s earnings after the contract which had been
applied to the payment of these debts. Held that, as the use of the earn-
ings of the V. Co. to pay its old floating debt had increased the amount
which the C. Co. had been obliged to pay under its guaranty of the interest
on the bonds, it was equivalent to an advance by the C. Co. equal to the
amount of earnings so applied for the payment of such debts, and, as such,
secured by, and entitled to be paid out of, the proceeds of the bonds de-
posited by the W. Co.

4. SAME—SET-OFF OR COUNTERCLAIM.

Held, further, that if the W. Co. had a claim against the C. Co. for breach
of its guaranty of the interest on the bonds, the fact that such claim would
be in personam, while that of the C. Co. against the bonds was in rem,
would not prevent the two claims being set off against each other in equity.

5. SAME—CANCELLATION OF GUARANTY CONTRACT.

Held, further, however, that the retaking by the W. Co. of the stock de-
livered by it and deposited to secure the agreement was a cancellation, as
to the bonds held by it, of the C. Co.'s contract of guaranty, so far as the
same remained still executory, and accordingly the W. Co. had no claim
against the C. Co. for breach of its guaranty.

[1] Rehearing denied July 6, 1897.

6. SAME—LEASES—AGENCY.

*Held*, further, that a lessee from the C. Co. of its railroad system which had paid Car Trust obligations of the V. Co., did so not as a volunteer, but as the agent of the C. Co., and, having acquired the debt so arising in favor of the C. Co., was entitled also to the security attaching to it, and accordingly to be reimbursed out of the bonds deposited by the W. Co. to secure the car trust obligations of the V. Co.

7. SEPARATE APPEALS—WAIVER OF CITATIONS—APPEARANCES.

Four appeals were taken by different parties from the same decree. All parties to the suit, by a single instrument, waived citations on "all the appeals." The record was made up as on one appeal. *Held*, that all parties to the suit appeared as parties to all the appeals, though the appeal bond on one appeal ran to one party only.

Appeals from the Circuit Court of the United States for the District of Kentucky.

These are four appeals from a decree of the circuit court for the district of Kentucky adjudging the priority of the liens of the various appellants and the Central Trust Company, one of the appellees, upon the entire property of the Ohio Valley Railroad Company which was being foreclosed under a mortgage issued by it to the Central Trust Company to secure a large number of bonds, and also the priority of the liens on certain of these bonds deposited with the Columbia Finance & Trust Company under a contract made between the Western Contract Company, a party to these appeals, and the Chesapeake, Ohio & Southwestern Railway Company, represented in these appeals by St. John Boyle, its receiver. The Ohio Valley Railroad Company (hereafter called the "Valley Company") owned a railroad running originally from Evansville, Ind., through Henderson, Ky., to Preston, where it intersected the railroad of the Chesapeake, Ohio & Southwestern Railway Company. Subsequently the Ohio Valley Railroad was extended through Preston about 12 miles to Hopkinsville, a point on the Louisville & Nashville Railroad. This extension, which plays some part in the issues of the case, was known as the "Hopkinsville Extension." The Chesapeake, Ohio & Southwestern Company (hereafter called the "Chesapeake Company") owned and operated a line of railroad from Memphis to Louisville. The Western Contract Company (hereafter called the "Contract Company") was a construction company which built part of the Ohio Valley Railroad extending from Evansville to Preston, and became thereby the owner of a large majority of its stock and its bonds. In order to enable it to dispose of the bonds held by it, it entered into a contract with the Chesapeake Company by which, in consideration of receiving a majority of the stock in the Valley Company from the Contract Company, the Chesapeake Company agreed to guaranty all the bonds theretofore issued by the Valley Company. That contract, upon which turns all but one of the important questions in this case, was executed on the 6th of March, 1891, and was as follows:

"Agreement made and entered into the sixth day of March, 1891, by and between the Western Contract Company of Louisville, Kentucky, a corporation created, organized, and existing under the laws of the state of Kentucky, hereinafter called the 'Contract Company,' of the first part, and the Chesapeake, Ohio & Southwestern Railroad Company, a corporation created, organized, and existing under the laws of the states of Kentucky and Tennessee, hereinafter called the 'Railroad Company,' of the second part. Whereas, the Ohio Valley Railway Company is a corporation of the state of Kentucky having a capital stock of two million one hundred and sixty-two thousand six hundred dollars ($2,162,600), and no more, and, in addition to its existing floating indebtedness and liabilities, being liable for the following, and no other, debts,— that is to say: (1) A bonded indebtedness to an amount not exceeding two million one hundred and sixty-two thousand and six hundred ($2,162,600) with interest thereon from January 1, 1891, represented by its first mortgage five per cent. forty-year gold bonds, and its general consolidated and first mortgage five per cent. fifty-year gold bonds now outstanding; (2) Car Trust obligations to the amount of eighty-eight thousand eight hundred and five and

$^{64}/_{100}$ dollars ($88,805.64); and (3) real-estate notes to the amount of fourteen thousand dollars ($14,000), given in payment for real estate purchased in Henderson, Kentucky, to secure approaches to the Henderson bridge and for terminals. And whereas, the Contract Company is the holder of upwards of sixty per cent. of the capital stock of said Ohio Valley Railway Company, and is interested in and desirous of procuring a guaranty of the payment of the principal and interest of said general consolidated and first mortgage bonds of the Ohio Valley Railroad Company. And whereas, it has been agreed between the parties hereto as hereinafter expressed: Now, therefore, this agreement witnesseth that the parties hereto, in consideration of the premises and of the mutual undertakings, covenants, and agreements hereinafter contained, have undertaken, covenanted, and agreed, and do hereby undertake, covenant, and agree, to and with each other as follows; that is to say:

"First. The Contract Company on or before the first day of April, 1891, will deliver to the Railroad Company, party of the second part hereto (to be simultaneously deposited by the Railroad Company with a trustee as hereinafter provided), sixty per cent. of all outstanding capital stock of the Ohio Valley Railway Company (the same being full-paid stock), and will cause to be delivered to the Ohio Valley Railway Company the control of the charter of the Evansville Bridge Company, and will give to the Railroad Company a guaranty satisfactory to it, that all indebtedness and liabilities of said Ohio Valley Railway Company which have accrued or may accrue up to the time of the delivery and deposit of stock and bonds under this article of this agreement (including accrued, though unmatured, interest on all obligations and liabilities, and including all claims for right of way or compensation therefor, or land damages or damages for construction or operation of its railroad), excepting only the bonded indebtedness, not exceeding $2,162,600, above referred to, and the interest from January 1, 1891, thereon, and the said real-estate notes for $14,000 and unpaid interest thereon, and the face value of the said Car Trust obligations of said Ohio Valley Railway Company, shall not exceed the sum of thirty thousand dollars, and that any excess thereof above that sum shall be paid by the Contract Company, and will deposit with the trustee hereinafter named general consolidated and first mortgage five per cent. fifty-year bonds of the Ohio Valley Railway Company (forming part of the bonds above referred to) to the amount at their par value of the face value of such Car Trust obligations, which bonds, and the interest thereon, and the proceeds thereof are to be held as security for, and applied in discharge of, the amount due upon such Car Trust obligations, and will also deposit with said trustee thirty thousand dollars par value of such general consolidated and first mortgage five per cent. fifty-year bonds, which bonds and the interest thereon and the proceeds thereof are to be held as security for and applied in discharge of the indebtedness and liabilities of said Ohio Valley Railway Company other than the Car Trust obligations and real-estate notes above referred to. The said railroad company is to be entitled to sell and dispose of the general consolidated and first mortgage bonds of the Ohio Valley Railway Company so deposited as security for payment of such Car Trust obligations and such indebtedness and liabilities at such prices not less than 90 per cent. of their par value, and upon such terms as it may from time to time determine, the proceeds of such bonds, simultaneously with the delivery thereof by said trustee to the purchaser, to be deposited with the said trustee. but subject to be drawn against by the Ohio Valley Railway Company for payment of the amount from time to time due on such Car Trust obligations, or such indebtedness or liabilities, or for repayments of amounts paid on account of such Car Trust obligations or such indebtedness or liabilities.

"Second. Upon the performance on the part of the Contract Company of the obligations hereinbefore in article first hereof expressed, the said Railroad Company will, under and in pursuance of adequate statutory authority and of sufficient resolutions of the stockholders and directors, guaranty the payment of the principal and interest accruing subsequently to January 1, 1891, of the general consolidated and first mortgage fifty-year five per cent. gold bonds of the said Ohio Valley Railway Company to the amount at their par value of $2,162,600, hereinbefore referred to, such guaranty to be indorsed on each bond in the following words and figures; that is to say: 'For valuable

consideration, the Chesapeake, Ohio & Southwestern Railroad Company hereby guaranties the punctual payment of the principal of and interest accruing subsequently to January 1, 1891, on the within bond. In witness whereof the said Chesapeake, Ohio & Southwestern Railroad Company has caused its corporate seal to be hereunto affixed and attested by its secretary, and these presents to be signed by its president or vice president, this ——— day of ———, 1891." And the said Railroad Company has undertaken and agreed, and hereby undertakes and agrees, that simultaneously with its receipt of said sixty per cent. of such stock of the Ohio Valley Railway Company it will deposit the same with the trustee hereinafter named as security for the fulfillment for the period of seven years from the execution of such guaranty of its obligations thereunder, subject to the provision that, in case during such period it shall fail to fulfill its obligations under such guaranty, upon demand made upon said Railroad Company at its office in the city of New York by the trustee of the mortgage securing such general consolidated and first mortgage bonds, said deposited stock shall, upon demand, sustained by the affidavit of the president or vice president of the trustee of such mortgage that such demand has been made upon said Railroad Company as hereinbefore required, be delivered by said trustee to said Contract Company; but that unless or until it shall so fail to fulfill its obligations such deposited stock shall stand on the books of the Ohio Valley Railway Company in the name of the said Chesapeake, Ohio & Southwestern Railroad Company, or the names of its appointees, and it and they shall be deemed the legal owners thereof, and be entitled to vote thereon, and exercise the rights and powers of stockholders in respect thereof. At the expiration of seven years from the execution of such guaranty, if the obligations of the Railroad Company during such period thereunder shall have been fulfilled, such deposited stock shall, by said trustee, be redelivered to said Railroad Company.

"Third. Earnings from traffic shall be apportioned between the Ohio Valley Railway and the Chesapeake, Ohio & Southwestern Railroad as if they were operated as separate roads, and substantially on the same basis as now in use, and the general expenses common to the operation of said lines shall be prorated on a mileage basis. The Ohio Valley Railway Company shall be maintained as a separate organization. All improvements and betterments shall be held as its separate property, and all rolling stock purchased for it shall be properly marked as its property.

"Fourth. The depositary trustee under this agreement shall be the Columbia Finance & Trust Company of Louisville, Kentucky, or such other trust company as may be agreed upon by the parties hereto.

"Fifth. This contract is signed subject to the approval of the respective boards.

"In witness whereof the parties hereto have caused their respective corporate seals to be hereunto affixed and attested by their respective secretaries, and these presents to be signed by their respective presidents or vice presidents, the day and year first above written.

"[Signed]          Western Contract Company, by Samuel S. Brown.
"[Signed]          Chesapeake, Ohio & Southwestern Railroad Co.,
                        By C. P. Huntington, Pt."

The above was accompanied by a supplementary agreement as follows:

"Referring to contract between the Western Contract Company and the Chesapeake, Ohio & Southwestern Railroad Company, executed and exchanged to-day, it is understood that the Chesapeake, Ohio & Southwestern Railroad Company is to designate the president and four directors of the Ohio Valley Railway Company, and that Capt. S. S. Brown is to remain as vice president and director, and is to designate two other directors of the company.

"March 6, 1891.
"[Signed]                                    C. P. Huntington, Pt.
"[Signed]                                    Samuel S. Brown."

The stock was transferred in accordance with the contract and was deposited with the Columbia Finance & Trust Company, of Louisville. Dr. P. G. Kelsey was president of the Valley Company at the time of the execution of this contract. He remained its president until late in the summer or early in the fall

of 1891, and while he was president the earnings of the Valley Company were kept in a fund separate from that of the Chesapeake Company or its lessee. The Chesapeake Company had leased its road running from Memphis to Louisville to the Newport News & Mississippi Valley Company (hereafter called the. "Newport News Company"), a corporation of Connecticut, organized to manage railroads for other companies. The lease by the Chesapeake Company to the Newport News Company provided a rental of $5,000 a year to be paid by the Newport News Company to the Chesapeake Company for the purpose as stated in the lease of sustaining the organization of the Chesapeake Company. The lease provided that the Newport News Company should take charge of all the cash, accounts payable, and choses in action of the Chesapeake Company of whatever kind, and should operate its main road and all its branches; that out of the net earnings and income of the railroad the Newport News Company should pay the operating expenses, taxes, assessments, insurance, should keep the road and equipment in proper repair, and should apply the net earnings to the payment of the interest on certain bonds of the lessor company and its grantors. The lease provided that, if there was any balance left after such payments, and that balance should exceed the amount of 6 per cent. per annum par value of the capital stock of the lessor company, the lessee company might retain to itself for its own use this excess. The lease further provided that, if anything was left out of the income after the payment of interest on certain bonds, and there should be any sum owing from the party of the first, part to the party of the second part "in respect to advances or payments made for any expenses of its business or affairs, or for or in respect of any other sums which may have been lawfully advanced by the lessee to or for the party of the first part," the party of the second part should be entitled to retain and pay to itself whatever might be owing to it from the party of the first part "for or in respect of any of the causes and matters or considerations aforesaid, including any interest which may be due and owing from the party of the first part to the party of the second part thereon." From November, 1891, until the 1st of July, 1893, the management and officers of the Chesapeake Company, the Newport News Company, and the Valley Company were practically the same. A good deal of money was expended in the repair of the Valley road. Both roads were really operated by the Newport News Company. Except for a short period, all the earnings of the Valley Company were deposited in the bank account of the Newport News Company, and all payments of every sort for and on account of the Valley Company were made out of this general bank account. Accounts were kept on books of the Valley Company, on books of the Newport News Company, and on books of the Chesapeake Company, but the only company which received earnings and disbursed expenditures was the Newport News Company. All repairs that were made upon the Valley Company were made by men who were on the pay roll of the Newport News Company. All the supplies and materials were furnished from the storehouse of the Newport News Company. But the salaries and wages of those engaged in making and superintending the repairs of the Valley Company were in part charged to the Valley Company and in part charged to the Newport News Company. The Newport News Company, acting as the agent of the Chesapeake Company, charged to the Chesapeake Company at various times its expenditures on account of the Valley Company, and, on the other hand, credited the Chesapeake Company with the receipts of the earnings from the Valley Company, together with the receipts from bonds issued by the Valley Company and from subsidies voted to the Valley Company by various counties through which its line was extended. The account of the Newport News Company with the Valley Company, and on the books both of the Newport News Company and of the Chesapeake Company, was an account current in which items of debit and credit were regularly entered, and a balance struck on the 30th of June of each year, and that balance carried forward into the next year upon the proper side of the ledger. Upon the 30th of June, 1893, the lease of the Newport News Company from the Chesapeake Company was canceled by the agreement of the two companies, and thereafter the Chesapeake Company took the place of the Newport News Company in its management of the Valley Company. It should be said that there was neither a lease nor any express running arrangement, parol or in writing, between the Valley

Company and the Newport News Company, nor between the Valley Company and the Chesapeake Company, but because the latter company owned a majority of the stock, and elected the board of directors and officers, the majority of whom were the same as those of the Newport News Company and of the Chesapeake Company, the management was the same, and the operations of the two roads were kept separate only by proper charges upon the books. In February, 1894, when both the Chesapeake Company and the Valley Company went into the hands of receivers, there was due, according to the books and accounts, from the Valley Company to the Chesapeake Company the sum of $160,252.86. This indebtedness was made up by a charge against the Valley Company of interest upon the bonds of the Valley Company paid by the Chesapeake Company, amounting to $216,200, and an expenditure for the construction of the Hopkinsville Extension of $192,689.85. To pay this amount, the Chesapeake Company received from the sale of bonds of the Valley Company $174,000, and from subscriptions $133,009.80, leaving a balance due and unpaid of $101,190.20, which represented the advances on account of the Valley Company by the Chesapeake Company for purposes other than the payment of operating expenses. In addition to this sum, the Chesapeake Company also paid out in operating expenses and repairs over and above the earnings received from the Valley Company the sum of $59,062.66. It was contended in the circuit court by the receiver of the Chesapeake Company that he had the right so to arrange the account between the two companies as to apply all the payments made to those debits for which the company could not have a lien, and to leave as unpaid the expenses for operating the Valley Company, and the repairs, so as to give a lien prior to the mortgage debt upon the Ohio Valley Company's road, both in equity and under the following statute of Kentucky:

"Section 1. When the property or effects of any railroad company, or of any owner or operator of any rolling mill, foundry, or other manufacturing establishment, whether incorporated or not, shall be assigned for the benefit of creditors, or shall come into the hands of any executor, administrator, commissioner, receiver of a court, trustee, or assignee, for the benefit of creditors, or shall in anywise come to be distributed among creditors, whether by operation of law, or by the act of such company, owner or operator, the employés of such company, owner or operator in such business, and the persons who shall have supplied materials or supplies for the carrying on of such business, shall have a lien upon so much of such property and effects as may have been embarked in such business, and all the accessories connected therewith, including the interest of such company, owner or operator in the real estate used in carrying on such business.

"Sec. 2. The said lien shall be superior to the lien of any mortgage or other encumbrance heretofore or hereafter created, and shall be for the whole amount due such employés as such, or due for such materials or supplies: provided, that no president or other chief officer, nor any director or stockholder of any such company, shall be deemed an employé within the meaning of this act."

Gen. St. Ky. (Ed. 1888) c. 70, art. 3, p. 877.

This claim was set up in the intervening petition filed by the then receivers of the Chesapeake Company, to which the Trust Company, the trustee of the mortgage bondholders, was made a party. The intervening petition prayed for a money decree for the amount of the indebtedness against the Valley Company as well as the enforcement of a lien prior to the mortgage. Judge Parr, sitting at the circuit, held that the circumstances of the indebtedness were such that the Chesapeake Company acquired no lien upon the property of the Valley Company, and refused to allow a money decree for the amount shown to be due. From the decrees of the circuit court embodying these rulings, the now sole receiver, St. John Boyle, appeals.

The other questions in the case arose upon the construction of the contract of March 6, 1891. The receivers of the Chesapeake Company, by their intervening petition, made the Western Contract Company and the Valley Company parties, and the controversy as between the receivers and the Contract Company was over the 116 bonds which were deposited with the Columbia Finance & Trust Company in accordance with that contract; 30 of them to pay the floating debt of the Valley Company, and 86 of them to pay the Car

Trust obligations of the Valley Company. The claim of the receivers on this point was that about $10,000 was expended in paying prior debts of the road contracted and owing April 1, 1891, and $24,462 in paying Car Trust obligations, all out of the subsequent earnings of the Ohio Valley road; and that as these earnings, if not so diverted, would have been available to assist the Chesapeake Company in meeting the interest due on the Valley bonds, which the Chesapeake Company paid, the receivers of the latter company were entitled to have part of their debt thus contracted paid out of the bonds deposited by the Contract Company to pay the floating debt and Car Trust obligations of the Valley Company. The United States Trust Company, as the assignee in the trust deed of the Newport News Company, filed its intervening petition against the Contract Company seeking to appropriate the 86 bonds deposited under the contract of March 6, 1891, to repay the $49,898.83 paid by the Newport News Company to take up additional Car Trust obligations of the Valley Company. These payments, it appears from the evidence, were never charged by the Newport News Company against the Chesapeake Company upon the books of either company, but they were made at the request and on account of the latter company. Another intervening petition was filed by Samuel S. Brown, Arthur Cary, Jordan Giles, P. G. Kelsey, and the Ohio Valley Coal & Mining Company, insisting that, if the receivers of the Chesapeake Company were entitled to appropriate the 30 bonds deposited under the contract of March 6, 1891, to meet the floating debt of the Valley Company, they, as owners of much of that debt, were also entitled to share in the proceeds of those bonds. The Contract Company filed answers to these intervening petitions in which it denied the right of any of the claimants to use the bonds deposited under the contract of March 6, 1891, for the purposes proposed. Against the receivers of the Chesapeake Company the Contract Company pleaded a set-off arising out of the failure of that company to fulfill its guaranty under the contract of March 6, 1891. It appears from the evidence that the Chesapeake Company fulfilled its guaranty of the bonds of the Valley Company upon all payments of interest due until the one of January 1, 1894, became due when it defaulted. Upon an intervening petition shortly thereafter filed by the Contract Company in the creditors' suit in which receivers were appointed for the Chesapeake Company, the Contract Company prayed for an order of the court requiring the receivers to consent and direct that the trustee under the contract of March 6, 1891, deliver back to the Contract Company the majority of the stock of the Valley Company in accordance therewith. The court granted the prayer of the petition, and directed the receivers to consent to the redelivering of the stock, and the trustee, the Columbia Finance & Trust Company, did deliver the same back to the Contract Company early in 1894. In order more definitely to fix the facts concerning payments made on the old debts of the Valley Company paid out of its earnings after April 1, 1891, and also by the Newport News and the Chesapeake Companies, the circuit court referred the case to a master for answers to certain questions. The report of the master upon these questions is as follows:

"This action has been referred to me as special commissioner to ascertain and report to the court:

"First. What is the amount of any debts due by the Ohio Valley Railway Company on April 1, 1891, which since that date have been discharged out of its earnings since that date, and what is the amount of any such debt which has been paid by the Newport News & Mississippi Valley Company for the benefit of the Chesapeake, Ohio & Southwestern Railroad Company.

"Second. What, if any, Car Trust notes of the Ohio Valley Railway Company, existing on the 1st of April, 1891, have since that time been paid out of its subsequently accruing earnings, or by the Chesapeake, Ohio & Southwestern Railroad Company, or by the Newport News & Mississippi Valley Company, or in any other way.

"Third. What debts are still outstanding which were owing by the Ohio Valley Railway Company April 1, 1891, and who owns and holds such debts.

"Fourth. What is the amount of the fund in the hands of the Columbia Finance & Trust Company, deposited by the Western Contract Company, either in bonds or in money.

"Fifth. What is the amount of bonds held by the Western Contract Company over and above the 116 bonds deposited by it with the Columbia Finance

& Trust Company, and what amount of interest is still due and unpaid on such bonds.   *   *   *

"(1) Under the first clause of said order of reference, I find the following facts:   The amount of debts due by the Ohio Valley Railway on April 1, 1891, was $51,457.85.   Of this amount the following have been paid:

| | |
|---|---:|
| Mechanical wages | $ 802 57 |
| Audited vouchers | 2,561 94 |
| L. & N. R. R. track rental | 798 00 |
| Bills payable, O. V. C. & M. Co | 4,500 00 |
| Individuals and companies | 1,376 62 |
| Total | $10,039 13 |

"It is contended on the one side that all of these payments should have been made out of the company's resources other than its earnings.   These alleged resources were as follows:

### Resources.

| | |
|---|---:|
| U. S. P. O. dept | $ 283 58 |
| Accounts receivable | 461 22 |
| Company's agents | 327 25 |
| Evansville Bridge Co | 10 25 |
| Stone quarry | 1,600 00 |
| Sundry r'ds. for pro of claims paid | 2,482 91 |
| Jas. F. Clay | 710 00 |
| Unclaimed f't transportation chgs | 35 28 |
| Southern extension acct | 12,452 37 |
| | $18,362 86 |

"But it is claimed on the other hand that two items of said alleged resources, which constitute more than two-thirds of the whole amount, were not, and could not have been, applied to the payment of said debts.   These two items were:

| | |
|---|---:|
| The stone quarry | $ 1,600 00 |
| The Southern extension acct | 12,452 37 |
| Total | $14,052 37 |

"As to the first item, Dr. Kelsey testifies that the Ohio Valley Company had, prior to April 1, 1891, purchased the stone quarry, and paid therefor the sum of $1,600; that it was thought more economical to buy the quarry than to pay a royalty for rock to make ballast, as they had been doing theretofore.   The company seems to have treated the quarry as so much ballast on hand, and for this reason included it among its resources, but the witnesses do not state there was any agreement that it should be invoiced in this way.   Doubtless the net earnings of the road were increased to the extent that the company was relieved of the royalty it would have otherwise been compelled to pay for rock; but there is no testimony as to what the royalties would have 'been, nor as to how much of the quarry has been exhausted.

"As to the other item, 'The Southern Extension Acct.,' the following facts are established by the testimony:  The Ohio Valley Company, contemplating an extension of its line south to Hopkinsville and Clarksville, had, prior to April 1, 1891, caused surveys, maps, profiles, etc., to be made and secured, and some contracts for right of way, at a cost of $12,452.37, which had been entered on the books as an asset.   Dr. Kelsey testifies that in making this contract with the C., O. & S. W., its representative, Mr. Huntington, was asked to allow this item to be placed on the same footing with material on hand, which was to be charged to the new organization at its invoice price.   To this Mr. Huntington objected, saying they would not pay for these things until the subsidies which the company expected to receive for the extension were realized.   Upon cross-examination the witness says no other agreement than this was ever made with Mr. Huntington.   The witness does not state that any of the subsidies were ever collected.   We submit to the court whether, under this

testimony, either of those two items was available for the payment of liabilities. If they were available, then the resources were sufficient to pay the liabilities that were canceled, amounting to $10,039.13, and leave a surplus of $8,323.73. But, if they were not available, then there remained only $4,310.49 of the resources that could have been applied to the debts, leaving $5,726.64 as the sum paid out of the earnings of the Ohio Valley Railway after April 1, 1891. I further find that the Newport News & Mississippi Valley paid of such debts the sum of $2,937.70, of which the sum of $1,089.08 was paid out of the assets of the Ohio Valley, leaving a balance of $1,848.62 paid by the Newport News & Mississippi Valley for the benefit of the C., O. & S. W. I further find that the C., O. & S. W. paid of said debts the sum of $77.99.

"(2) Under the second clause of said order I find that of the Car Trust notes of the Ohio Valley Railway Company existing on April 1, 1891, there have since that time been paid out of its subsequently accruing earnings the following sums:

| | |
|---|---|
| Notes maturing on April 1, 1891 | $ 3,203 72 |
| May | 4,218 39 |
| June | 3,203 72 |
| July | 3,203 72 |
| August | 2,189 05 |
| September | 3,203 72 |
| October | 5,240 26 |
| Making a total of | $24,462 58 |

"I further find that the Newport News & Mississippi Valley has paid Car Trust notes of the Ohio Valley Railway Company that existed on April 1, 1891, amounting to $49,898.83.

"(3) Under the third clause of said order, I find that the following debts of the Ohio Valley Railway Company owing April 1, 1891, are still outstanding, and are owned and held by the following parties, viz.:

| | |
|---|---|
| To Arthur Cary | $ 4,500 00 |
| To Jordan Giles | 953 11 |
| To P. G. Kelsey | 3,438 13 |
| To S. S. Brown, as owner of steamer Campbell | 23,574 98 |
| To Ohio Valley Coal & Mining Co | 8,952 50 |
| Making a total of | $41,418 72 |

"(4) Under the fourth clause of said order, I find that the account of the Columbia Finance & Trust Company for the bonds deposited with it by the Western Contract Co. stands as follows: Bonds on hand of the O. V. R. Co., numbered from 1,849 to 1,964, inclusive, being 116 bonds, of the face value of $116,000. Five sets of coupons collected, amounting to $14,500; out of which collections it has paid the following expenses:

| | |
|---|---|
| Expressage on bonds, &c | $ 101 10 |
| Counsel fees in C., O. & S. W. case | 50 00 |
| Counsel fees in this case | 100 00 |
| | $ 251 10 |
| Leaving cash balance on hand | 14,248 90 |

"(5) Under the fifth clause of said order, I find that the Western Contract Company holds 480 of the bonds of the Ohio Valley Company, amounting to $480,000, without including 116 bonds deposited with the Columbia Finance & Trust Company, all of which are indorsed by the C., O. & S. W. according to its contract. Since the coupons which fell due July 1, 1893, no interest has been paid on these bonds."

The circuit court held that the Chesapeake Company and its successors, the receivers, would have been entitled to resort to the bonds deposited under the contract of March 6, 1891, to the extent, if any, to which earnings of the Valley Company after April 1, 1891, had been used to pay the floating indebtedness of the Valley Company, but that really there was no diversion of earnings

for this purpose because the old management of the Valley Company had on hand and delivered over to the Newport News Company, when, as agent for the Chesapeake Company, it assumed the management of the Valley Company, enough "quick" assets, easily reducible to money, to pay the entire floating indebtedness.   The court further held that as to the $24,462 of earnings diverted to pay Car Trust notes the Chesapeake Company and its receivers were entitled to apply in repayment thereof such number of the bonds deposited as, at 90 per cent. of their face value, would be required to satisfy and pay the amount thus diverted from the Valley Company, together with the interest paid on such bonds, and held in .cash by the trustee.   The court refused to allow the set-off claimed by the Contract Company for the default in the guaranty of interest by the Chesapeake Company on two grounds:  First, that the set-off could not be granted in equity where the debt set off was a debt in personam and that against which it was to be set off was a debt in rem; and. second, that the taking back of the majority of stock, which was the general consideration for the guaranty, canceled and destroyed, as between the Contract Company and the Chesapeake Company, any obligation on the part of the latter to fulfill the guaranty.   Upon the intervening petition of the United States Trust Company, the court held that in paying the Car Trust obligations the Newport News Company was a volunteer, and could not be subrogated to the rights of the Chesapeake Company under the contract of March 6, 1891, and, therefore, had no interest in the deposited bonds.   With reference to the intervening petition of Brown and others, the court held that the contract of March 6, 1891, did not inure to their benefit, and that they could not take advantage of the bonds deposited thereunder.   The decree appealed from embodied the rulings of the court above stated by appropriate findings and orders.

Humphrey & Davie, for Western Contract Co. and Ohio Valley Ry. Co.

Edward W. Sheldon and W. O. Harris, for United States Trust Co.

Helm & Bruce and Grubbs & Morancy, for receivers of C., O. & S. W. R. Co.

Before TAFT and LURTON, Circuit Judges, and SEVERENS, District Judge.

TAFT, Circuit Judge (after stating the facts as above).   The decree of the circuit court in dismissing the intervening petition of the receivers of the Chesapeake Company, in so far as it sought a lien on either statutory or equitable grounds for their claim against the Valley Company prior to that of the mortgage bonds on the corpus of the Ohio Valley Railroad, was clearly right.   The Chesapeake Company was not the supplier of materials or a contractor.   By its agent and lessee, the Newport News Company, it assumed the operation of the railroad of the Valley Company.   All the earnings of the Valley Company and of the Newport News Company were deposited in a common fund, which, for convenience, was designated as the bank account of the latter company.   Out of this common fund wages were paid and supplies were purchased generally in the name of the Newport News Company, but really for the benefit of both.   By proper charges upon the books, it was made to appear how much more money out of the common fund was devoted to the operation of the Valley road than was received from its operation, and the balance struck doubtless correctly showed the amount due from the Valley Company to the Chesapeake Company, but the balance shown was not really for supplies and labor furnished, but was for money advanced, and for that no lien exists either by the Kentucky stat-

ute, or on principles of equity. The case at bar is in this respect very much like that of Morgan's L. & T. R. & S. S. Co. v. Texas Cent. Ry. Co., 137 U. S. 171, 11 Sup. Ct. 61. In that case the complainant was the assignee of a large claim of the Houston Company against the Texas Central Company, and the bill was filed to establish the priority of the claim as a lien on the railroad of the Texas Company over that of the two mortgages on the ground that the claim arose for supplies and labor furnished to the Texas Company. One paragraph of the opinion of the Chief Justice in delivering the judgment of the court shows clearly the likeness of the case to that at the bar, and the true ground for denying the lien sought. After referring to Fosdick v. Schall, 99 U. S. 235, and subsequent authorities upon the question of equitable liens for supplies, the chief justice said:

"In the light of these decisions, the inquiry before us is whether these bondholders are to be postponed in respect to the proceeds of the sale of the corpus of the property upon which their lien is first and paramount, to this claim of the Houston Company, upon the ground of the particular application of these moneys, or that they supplied a diversion by the officers of the Texas Company equitably binding as such upon the bondholders. Now, if these advances were made generally, as needed by the Texas Company, it matters not whether they were devoted to the payment of running expenses or not. The relation of debtor and creditor existed, and no equity could arise in favor of the creditor as against other creditors holding security prior in time, by reason of the voluntary application the debtor might make of the money borrowed. We repeat that, so far as appears, the money advanced to one road by the other was simply a loan. The account between the companies was a running account, and the balance was only a balance for cash advances made from time to time. Moneys received from the operation of the Texas road and moneys received from the Houston Company all went into a common fund, from which payments were made for expenses, taxes, and so on. It is also shown that the Texas Company and the Houston Company had the same fiscal agent in New York, who paid the coupons of both; that the management of the Texas Company was, during its entire existence, in the hands of the same officers and directors who managed the Houston Company; that these officers derived their compensation from the Houston Company; that all receipts from the Texas Company were first received by the Houston Company, and then transferred on the books to the treasurer of both companies as treasurer of the Texas Company; that whenever there was a deficit of funds on the part of the Texas Company, such deficit was made up by the Houston Company; and that the latter company received and disbursed everything. Under such circumstances it cannot be maintained, against the first mortgage bondholders, that a balance of such a running account of five years' duration represents money so applied to the current expenses of the road, or so diverted therefrom to the payment of interest on the bonds, as to carry with it a superior equity for repayment."

The case cannot be distinguished from the one at bar. The decree of the circuit court in this regard is affirmed.

We think that no error can be predicated on the failure of the circuit court to enter a decree for money in favor of the receivers of the Chesapeake Company against the Valley Company. The main action was the foreclosure of a mortgage, and the intervening petition of the receivers was allowed to be filed because it asserted a lien on the property of the railroad prior in right to that of the foreclosing mortgagee. If they had no lien, the receivers were entitled to no relief whatever. There is little or no analogy between this case and that in which a foreclosing mortgagee is allowed a judgment for the deficiency on his claim after the application to his debt of

the proceeds of the sale of the mortgaged property. In such a case, a court of equity acquires jurisdiction by reason of the necessity for the foreclosure proceedings, and the judgment for the deficiency is a mere incident, necessary to a complete adjustment of the rights of the parties. Until especially conferred by one of the equity rules, a federal court of equity had no power to enter judgment for a deficiency, even in case of a foreclosure. In the case at bar, there is found to be no lien at all, and there is, therefore, no deficiency of assets in the sense in which that term is understood in a foreclosure suit. If a decree had been rendered for money only, it would seem that the court's jurisdiction to render the decree could hardly have been sustained, because the right to a trial by jury upon such an issue would thus have been denied to the debtor company. Without deciding more, however, we hold that it was at least within the discretion of the circuit court, after finding that the receivers of the Chesapeake Company were not entitled to a lien for their claim, to decline to enter a decree for money only.

We come now to consider the second count of the intervening petition of these receivers. They thereby seek to subject certain of the mortgage bonds issued by the Valley Company, and included in the foreclosure proceeding which belong to the Contract Company, and are on deposit with the Columbia Finance & Trust Company, to the satisfaction of a claim made by the receivers against the Contract Company under the contract executed March, 1891, by and between that company and the Chesapeake Company. Had objection been made to the petition on the ground that it was multifarious, it might have presented some difficulty; but no such objection was made, and, as the court undoubtedly had jurisdiction of both causes of action stated in the petition, the defect in the petition, if any, was clearly waived, as the circuit court held. The claim of the receivers of the Chesapeake Company is based upon the alleged diversion of the subsequent earnings of the Ohio Valley road to pay its floating debts and its Car Trust obligations incurred prior to the making of the contract of March 6, 1891. The objections urged to this claim are: First, that payments out of the subsequent earnings of the Valley road to take up its prior debts could give the Chesapeake Company no right to reimbursement therefor; second, that no earnings were used to pay floating debts; and, third, that the whole claim is more than set off by the amount due from the Chesapeake Company on its defaulted guaranty of interest. By the contract of March 6, 1891, the Contract Company delivered to the Chesapeake Company 60 per cent. of the stock of the Valley Company, and guarantied that the floating indebtedness of the Valley Company should not exceed $30,000, and that the Car Trust debts should not exceed $86,000, and provided for the payment of these debts by depositing with the Columbia Company as trustee bonds equal in par value to these respective amounts, and stipulated that the Chesapeake Company might sell the bonds at a price equal to and not less than 90 per cent. of par, and deposit the proceeds with the trustee, to be drawn against by the Valley Company for payment of the floating indebtedness of the Car Trust obligations, or for re-

81 F.—30

payment of amounts paid on account of either the floating or the Car Trust debt. In consideration of this, the Chesapeake Company agreed to guaranty the payment, principal and interest, of the Valley Company's mortgage bonds, aggregating $2,162,600; and further agreed to deposit, as security for the performance of this guaranty for seven years, the 60 per cent. of the capital stock of the Valley Company with the Columbia Company as trustee, and stipulated that in case of default on its guaranty during those seven years the trustee should, on demand, deliver back the stock to the Contract Company, but that until such default the Chesapeake Company should be deemed the owner of the stock; and that, if no default occurred during the seven years, then, at the expiration thereof, the stock should be redelivered by the trustee to the Railroad Company. By a third article it was provided that expenses should be prorated between the two railroads, the Valley and the Chesapeake, on a mileage basis, and that the earnings should be apportioned as if the roads were separate. The supplementary contract made provision for a representation of the minority stockholders in the board of directors of the Valley Company.

Looking at this contract in the light of the circumstances and the subsequent conduct of the parties, it is manifest that it was expected that the Chesapeake Company, or its agent and lessee, the Newport News Company, should operate the Valley road as a part of the Chesapeake, Ohio & Southwestern system; that by bookkeeping its earnings and expenses should be kept separate from those of the Chesapeake road, but that otherwise the roads should be treated as if one. It was evidently in the contemplation of the parties that the floating debt and the Car Trust notes might have to be taken up before the bonds were sold, and it was intended that the proceeds of the bonds when sold should replace the sums thus expended. This is clearly shown by the words "for repayments of amounts paid on account of such Car Trust obligations or such indebtedness or liabilities" used to specify the object to which the proceeds of the bonds were to be devoted. It was plainly intended that by the use of the bonds the indebtedness of the Valley Company should be paid, and that its future earnings should not be burdened with such an obligation. The primary advantage to the Chesapeake Company in this arrangement was that it rendered more probable the payment of the interest on the guaranty bonds, or some part of it, out of the earnings of the Valley road, and thus reduced the probable burden of the guaranty. The Chesapeake Company had in fact to pay a large part of the interest which was paid on the guarantied mortgage bonds. Hence it follows that every dollar of the earnings of the Valley road after April 1, 1891, used to pay the old floating debt of the Car Trust notes increased the amount which the Chesapeake Company had to pay as interest upon the bonds. We fully concur with the circuit court, therefore, in the view that the diversion of the Ohio Valley earnings to pay the old debts of the company was equivalent to a direct advance of that amount out of the treasury of the Chesapeake Company, and that if, for such advances, the Chesapeake Company would be entitled to repayment out of the

proceeds of the bonds deposited under the contract of March 6, 1891, then it is equally entitled to reimbursement for a diversion of the earnings of the Valley road to the same purposes. And now, what is the amount of this diversion? It appears that of the floating debt, $10,039.13 was paid by the Valley Company after April 1, 1891. It is said this was not paid out of the earnings of the Valley road, or by the Chesapeake Company, because there was on hand in possession of the Valley Company certain resources or "quick assets" amounting to $18,362.62, which were properly applicable to the payment of the floating debt. Of these so-called resources the $4,310 was really money in the hands of agents, and like accounts. It is not unreasonable to suppose that in treating and referring to the floating debt of the Valley Company the parties to the contract intended that such cash assets should be deducted from the gross amount, and that only the net results after the deduction should be regarded as the floating debt. At all events, as these assets were collected and expended, they may be presumed to have been applied to the old debts, and the diversion of the earnings was by so much less than the amount of the old debts paid. The remainder of the so-called resources, amounting to $14,052.37, was made up of $12,-452.37, known as the "Southern extension account," which was the amount expended by the Valley Company in making maps and a survey for an extension of the Valley road, and $1,600 paid for a quarry purchased to ballast the road. We are at a loss to see how such items could be used to reduce the liabilities provided for in the contract of March 6, 1891. The maps and surveys and the quarry were a part of the Valley Company's property as much as the rails or the stations of the road, and could not, we think, within the contemplation of the parties, figure on either side of the account in making a statement of the floating debt. We are constrained to differ with the court below in treating either the extension account or the quarry as a quick asset or resource to reduce the amount of floating debt paid out of earnings. The result is that earnings of the Valley Company were diverted to pay the old floating debt to the amount of $5,726.64. It also appears from the master's report that through its agent, the Newport News Company, and by direct payment, the Chesapeake Company also advanced $1,926.61 to pay off part of this floating debt. It also appears that out of the earnings of the Ohio Valley road Car Trust notes for $24,462.58 were paid. By the terms of the contract, we think the Chesapeake Company was entitled to reimbursement from the proceeds of the bonds deposited to pay the floating and Car Trust debts, thus shown to be $32,115.83. But the provision thus made for their payment contained a limitation, to wit, that the bonds could be sold at not less than 90 cents on the dollar. This requires, as the circuit court held, that only the number of bonds can be used in reimbursing the Chesapeake Company which would, at 90 per cent. of par, pay the debt. It appears that interest was collected by the trustee on the bonds held by him on deposit. We agree with the circuit court that those having a lien or claim upon the bonds may appropriate the interest on the bonds as an incident thereof.

It is vigorously pressed upon the court that as against this claim by the Chesapeake Company upon these bonds, the Contract Company, the owner of them, may set off the amount due from the Chesapeake Company to the Contract Company on its defaulted guaranty. The circuit court was of opinion that as the claim of the Contract Company against the Chesapeake Company was in personam, and the claim of the latter company against the bonds was in rem, there could be no set-off. In courts of the United States sitting in equity the most liberal rules prevail in the allowance of set-offs to avoid injustice and circuity of action. Scott v. Armstrong, 146 U. S. 507, 13 Sup. Ct. 148; North Chicago Rolling Mill Co. v. St. Louis Ore & Steel Co., 152 U. S. 615, 14 Sup. Ct. 715. In the latter case the court says:

"Cross demands and counterclaims, whether arising out of the same or wholly disconnected transactions, and whether liquidated or unliquidated, may be enforced by way of set-off whenever the circumstances are such as to warrant the interference of equity to prevent wrong and injustice."

In New Jersey (White v. Williams, 3 N. J. Eq. 376; Dudley v. Bergen, 23 N. J. Eq. 401; Dolman v. Cook, 14 N. J. Eq. 68; Bird v. Davis, Id. 471) it is held that a foreclosure of a mortgage is a proceeding in rem, and that the mortgagor cannot, therefore, be permitted to set off in·such an action a claim then due him from the mortgagee. This rule finds little or no support in other states, and we cannot understand the justice of it. If A. has a claim against B. which he is trying to enforce, we can understand why B. should not be permitted to set off against it a claim in rem in the nature of a lien or otherwise against property owned by A. for which A. is not personally liable. In such a case, there is no mutuality. B.'s only mode of enforcing his claim is by appropriation and sale of A.'s property, and it may be that B. will not thus realize enough to satisfy his claim. A., of course, cannot be held for the deficiency. B. cannot, therefore, be permitted to set off his lien claim as if A. owned it personally. But the reverse is not true. If B. is enforcing a lien against A.'s property, A. can remove the lien by paying to B. the amount secured by it. If so, why may he not be permitted to cancel the lien by forgiving B. the debt B. owes him; i. e. by setting it off? We are clearly of opinion that he may do so. Justice is thereby done, and circuity of action is avoided.

But, while we differ with the court below as to the law of set-off of claims, one in personam and one in rem, we concur in the conclusion reached by it upon the other ground upon which the decree appealed from was based, namely, that under the circumstances of this case there was nothing due from the Chesapeake Company to the Contract Company which the latter could set off. We think that the action of the Contract Company in taking back the stock ended the obligation of the Chesapeake Company upon its guaranty of the bonds of the Ohio Valley so far as the contract of March 6, 1891, was concerned. Of course, it could have no effect upon the guaranty indorsed on the bonds held .by purchasers without notice, but, as between the parties to the contract of March 6, 1891, we must hold that the effect of the retaking of the stock by the Contract Com-

pany was to cancel the contract as to the part of it executory and unperformed. It is said that there is nothing expressed in the contract to warrant such a conclusion. This may be conceded, but the circumstances and the real nature of the contract leave no doubt in our minds that the conclusion is in accordance with the intention of the parties. The contract between the parties, shortly stated, was that if the Contract Company would give the Chesapeake Company control of the Valley road, the latter would guaranty the Valley bonds, of which the Contract Company was a large holder. On a single default in the payment of interest the Contract Company reserved the right to resume control of the Valley road, not temporarily, but forever. Under the contract the reciprocal benefits to the parties were concurrent,—control of the road on one side, receipt of interest on the other. Any power reserved in the contract given to one to withdraw one of these concurrent benefits forever would seem, upon its exercise, to be consistent only with the release of the corresponding obligation of the other party. It is true that the Chesapeake Company must have known that, even though control of the Valley road might be withdrawn by retaking the stock upon default in the guaranty, it would not escape from its obligation upon bonds already sold to purchasers without notice. But this was an unavoidable incident to making a guaranty at all, and cannot, we think, change the view to be taken of the intention of the parties as to the binding force of the obligation of guaranty as between them after the Contract Company should resume possession forever of the only consideration inducing the guaranty. It is said that the Chesapeake Company has had control of the road for two years. That is true, but the Contract Company has had its interest. The road was improved by the new management, and, what is the most important benefit to the Contract Company, and that which doubtless led it into the contract, it has sold more than half a million of the Valley bonds at a price probably much increased by the indorsement of guaranty. But it is said, if the retaking of the stock rescinds the contract, how can the stipulations of the Contract Company as to the deposited bonds be enforced against it? Courts, in giving effect to rescissions, always, if possible, preserve vested interests and avoid a forfeiture. Railroad Co. v. Howard, 13 How. 307, 340. The stipulations as to the payment of the debts of the Ohio Valley Company were merely preliminary, and were inserted to clear the field of negotiation and contract for the concurrent operation of the two reciprocal benefits which the contract was intended to confer, each as an inducement for the other,—the control of the road on the one hand, the guaranty of the bonds on the other. The Chesapeake Company wished to be sure that the then debts of the Valley Company would not embarrass it in obtaining from the earnings of that road enough to pay the interest the Chesapeake Company had guarantied to pay, and the Contract Company accordingly provided for the debts by devoting to their payment bonds which it owned by depositing the bonds with a trustee for the purpose, and by expressly stipulating that money advanced to pay these debts of the Valley Company should be repaid from the proceeds of the bonds when sold. When the

bonds were deposited, and advances were made on the faith of them, the contract, so far as the Contract Company was concerned, was executed, the interest of the Railroad Company making the advances became fixed, the trustee holding the bonds became its trustee, and its rights in the bonds were as completely vested as if it had manual possession of them under pledge for a loan.

We have already pointed out that a diversion of the earnings of the Valley Company to pay these debts amounted, in effect, to an advance by the Chesapeake Company to pay them, because of the increase of the amount of interest on the guarantied bonds of the Valley Company which the Chesapeake Company was obliged to pay. To the extent that the debts and Car Trust notes of the Valley Company were paid, we think the contract executed, and that no subsequent rescission could or should affect the vested interest in the deposited bonds acquired by the Chesapeake Company through such payments.

It is suggested that the unsoundness of our conclusion will appear if we suppose that the Chesapeake Company had failed to pay the first installment of the guarantied interest. It is asked whether, in such a case, it would be equitable, after the Contract Company had retaken the stock, to allow the Chesapeake Company to have the bonds of the Contract Company sold, and to put the proceeds thereof in its pocket. . Certainly it would not, except to the extent to which the Chesapeake Company had directly expended its own money to pay such debts. As the Chesapeake Company in such a case would have paid no interest, the diversion of the earnings of the Valley Company to pay its old debts would give the Chesapeake Company no equity or right to be reimbursed out of the deposited bonds for such diversion. It is because the Chesapeake Company has paid a large amount of the guarantied interest, far in excess of the earnings of the Valley Company diverted, that the Chesapeake Company has a standing here to ask reimbursement equal to the diversion out of the bonds which were appropriated by contract, and actual deposit with a trustee to that specific purpose, before either the interest was paid or the earnings were diverted.

The next question is whether the United States Trust Company, as the assignee of the Newport News & Mississippi Valley Company, is entitled to subject part of the 86 bonds deposited under the contract of March 6, 1891, to meet Car Trust obligations, to the payment of the amount advanced by the Newport News Company when operating the Valley Road to discharge a large amount of those Car Trust obligations. It is conceded that the amount thus advanced was $49,898.33. The Chesapeake Company objects to the consideration of this appeal on the ground that it was not made a party thereto. An examination of the record shows an appeal allowed to the United States Trust Company without mention of the appellees. This was one of four appeals from the same decree. The record further contains a waiver in one instrument by all parties to the action below of the issuing of citations on "all the appeals." The record was made up as if in one appeal. Under these circumstances we must hold that all the parties to the action below have ap-

peared as parties to all the appeals now under consideration. It is true that the appeal bond of the United States Trust Company runs to the Western Contract Company alone as obligee, but this defect in the appeal bond cannot prevent the attaching of jurisdiction of all the parties appearing and waiving process. The giving and acceptance of an appeal bond is not jurisdictional. It is merely modal, and a defect in it is only an irregularity. Brown v. McConnell, 124 U. S. 489, 8 Sup. Ct. 559.

The learned judge at the circuit held that the United States Trust Company was not entitled to share in the security of the deposited bonds for the advances made by its assignor, the Newport News Company, to pay Car Trust obligations because it was a volunteer, and could not be subrogated, therefore, to the rights of the Chesapeake Company in respect of such security. We find ourselves unable to concur in this view. The Newport News Company, it seems to us, was nothing but the agent of the Chesapeake Company in making these advances, and it is in evidence that it made them at the request of the Chesapeake Company. It is true that there is nothing to show that the advances were ever charged on the books of account against the Chesapeake Company by the Newport News Company, but we must infer, in the absence of any averment to the contrary in any pleading by the receivers of the Chesapeake Company, that in the adjustment of affairs between the Newport News and the Chesapeake Companies at the cancellation of the lease, the latter company was permitted to become the real owner of the claim for these advances against the bonds, for a valuable consideration. Inasmuch as these advances were made for the Chesapeake Company, and at its request, the agent making them, and subsequently acquiring title to the debt based on them, has as much right to avail itself of the security deposited to secure repayment of them as the Chesapeake Company would have were it still the owner of the claim therefor. It is not, strictly speaking, a question of subrogation, as we view it. When these advances were made, they were the advances of the Chesapeake Company, and the security to repay them as an incident to the debt thus created between the Valley Company and the Chesapeake Company then attached, and passed with that debt into the hands of any assignee thereof. The mode of determining how many bonds and how much accrued interest are available as security for these advances must be the same as that followed with respect to the claim of the receivers of the Chesapeake Company; that is, the United States Trust Company shall be allowed as many bonds held by the trustee for Car Trust obligations as would be needed if sold at 90 per cent. of par to pay off the advances made. The accrued interest on these bonds which was paid in cash to the trustee, and is now held by him, is also to be appropriated to pay these advances as part of the security.

The appeal of S. S. Brown and others from that part of the decree below dismissing their intervening petition in which they, as creditors of the Valley Company, sought to take advantage of the same bond clause of the contract of March 6, 1891, under which we have held that relief may be granted to the Chesapeake Company and the

United States Trust Company, can be very shortly disposed of. The claims of the petitioners were part of the floating debt of the Valley Company contracted before the making of the agreement of March 6, 1891. That agreement was made for the benefit of the Chesa- peake Company to secure any advances made by it or on its account or at its expense to pay the floating debt. It was not made for the benefit of the owners of the floating debt or the Car Trust notes. The petitioners, even if they might otherwise have taken advantage of the clause, have not changed their position, or advanced money on the faith of the security of the bond clause; and therefore, in no aspect of the case can they enjoy the security afforded thereby. It is true that where A. makes a contract with B. for the benefit of C., C. may usually sue on it, and enforce its obligations against B. It is also true that under certain circumstances where C. is compelled to discharge an obligation of A. to B., C. may have the benefit of the same security for reimbursement as A. would have had, on princi- ples of subrogation. But neither of these principles applies in favor of Brown and his fellow petitioners—First, because the bond clause on which they rely was not made for their benefit; and, second, be- cause they have not discharged any obligation for the benefit of the Chesapeake Company.

The decree of the circuit court is in part affirmed and in part re- versed, and the case is remanded to the circuit court with instruc- tions to set aside the decree as entered and to enter a modified de- cree in accordance with this opinion. The costs of the appeal will be assessed one-half against the receivers of the Chesapeake Com- pany and one-half against the Contract Company and S. S. Brown and other petitioners.