FORDYCE et al. v. OMAHA, KANSAS CITY & E. R. R. et al. MISSOURI RY. CONST. CO. v. SAME. OAKMAN et al. v. SAME.

(Circuit Court, W. D. Missouri, W. D. April 11, 1906.)

Nos. 2,401, 2,404, 2,423.

1. RECEIVERS—PREFERENTIAL CLAIMS—RAILROADS—FORECLOSURE OF MORTGAGE.
    To entitle a general creditor of an insolvent railroad company to preference over a mortgage which covered not only the corpus of the railroad property of every kind and description, but also the net income after deducting current operating expenses, the debt must have been contracted upon the faith of being paid from such current income, and not created for construction or ordinary equipment; and even when so contracted, as a general rule, there is no equity which entitles the creditor to preferential payment over the mortgage from the proceeds of the property at foreclosure sale, where it brings less than the mortgage debt, or to subject the corpus of the property in the hands of the purchaser to its payment, unless it is shown that there was a diversion of net income to the benefit of the mortgagee, and the burden of proving such fact rests upon the claimant.

2. SAME—RIGHT OF PURCHASER TO CONTEST.
    The fact that the court, in a suit for foreclosure of a railroad mortgage, may in its orders have directed that preferential claims for supplies and materials be paid out of the proceeds of the sale or the corpus of the property in the hands of the purchaser, does not deprive the purchaser of the right to contest such claims, on the ground that they are subordinate in right to that of the prior mortgagee.

3. SAME—DIVERSION OF INCOME.
    Diversion by a railroad company of net income properly applicable to the payment of current claims for supplies, etc., to the benefit of a mortgagee, in order to entitle the holder of such a claim to priority of payment over the mortgagee from the corpus of the property, must have been made after the creation of the debt sought to be so enforced as an equitable lien.

4. SAME—IMPROVEMENTS BY RECEIVER.
    The fact that an indebtedness for permanent improvements incurred by railroad receivers in a creditor's suit to which a mortgagee was not at the time a party was authorized by the court does not effect a displacement of the mortgage lien in favor of such indebtedness, nor does the fact that at the time such indebtedness was authorized there was default on the mortgage, and the mortgagee might have become a party, amount to an acquiescence in the expenditure, which estops him to assert the priority of his lien, except as to income which may have been diverted to such purpose prior to the filing of his cross-bill.

5. EQUITY—EXCEPTIONS TO MASTER'S FINDINGS.
    Exceptions to findings of fact by a master should not be the general result, but must be specific, and point out the particular errors relied on, and where they are based on particular evidence should refer to the place in the record where the same may be found.

6. RECEIVERS—PREFERENTIAL CLAIMS—RAILROADS—FORECLOSURE OF MORTGAGE.
    Where a number of railroads owned by different companies were operated together as a single system, charges made by one against another for

rental of locomotives and expenses advanced in maintaining the joint officers and offices are not preferential, and entitled to priority over a prior mortgage given by the company charged, where there was no diversion of net income to the benefit of the mortgagee.

**7. SAME—CLAIM FOR BALLAST CARS.**

An indebtedness of a railroad company for ballast cars for use in improving its roadbed is not necessarily entitled to preference over a mortgage upon the corpus of the railroad property, and is not allowable as a preferred lien, where it appears that there was no net income from the operation of the road after it was contracted, either before or after the receivership.

**8. SAME—DIVERSION OF INCOME—PAYMENT OF RENT.**

Rent paid by railroad receivers on a lease of another road, made prior to the receivership, and adopted by them, does not constitute a diversion of income which entitles a creditor whose claim originated after the lease was made to preference over a mortgage out of the corpus of the property, but is an operating expense.

**9. SAME.**

A diversion of earnings by railroad receivers in making new constructions, even if it inures to the benefit of bondholders, will not avail to entitle an unsecured creditor to priority of payment over the mortgagee from the corpus of the property, unless it is further shown that but for such diversion there would have been net earnings subject to the equitable lien.

**10. SAME.**

A claim against a railroad company for breach of contract is not one on which a claim to preference over a mortgage can arise.

In Equity.   On exceptions to master's report.

The following is the portion of the master's report referred to in opinion:

A claim, to be preferential, must be one contracted upon the faith of being paid from the current income (Lackawana, etc., Co. v. Farmers', etc., Co., 176 U. S. 298, 20 Sup. Ct. 363, 44 L. Ed. 475), and must not be one created for construction or ordinarily for equipment (Rhode Island Locomotive Works v. Continental Trust Co., 108 Fed. 5, 47 C. C. A. 147; Illinois Trust & Savings Bank v. Doud, 105 Fed. 123, 44 C. C. A. 389, 52 L. R. A. 481; Atlantic Trust Company v. Dana, 128 Fed. 209, 225–230, 62 C. C. A. 657). Where there is no net income of the receivership, the question arises whether claims of a preferential nature can be charged against the property foreclosed, in the absence of proof of a diversion of income for the benefit of the mortgagees. The order appointing the receivers does not aid in the solution of the question, because by its terms it is limited to the net income of the receivership, of which, as hereinafter seen, there was none. Besides this, the claims presented not having been paid, the purchaser at the foreclosure sale can question their right to a preference. This has been clearly decided. In Louisville, etc., R. Co. v. Wilson, 138 U. S. 501, 506, 11 Sup. Ct. 405, 407, 34 L. Ed. 1023, 1025, Mr. Justice Brewer said: "We would not be understood as asserting, even by implication, that the terms of an order of appointment of a receiver vest in all claimants an absolute right as against the security holders. Such terms may be, and doubtless are, a protection to the receiver; and what he does and pays within those terms may be, thereafter, beyond the challenge of any party interested in the property. But when he has not acted, and the question is presented to the court as to the liability of the property for any claim, the court is not foreclosed by the order of appointment, but may consider and determine equitably the extent of liability of the property to such claim and what its rights of priority may be. Hence, as the receiver did not pay this claim, the parties in interest may rightfully challenge its priority, even if it were within the very letter of the order of appointment of the receiver." In Gregg v. Mercantile Trust Co., 109 Fed. 220, 226, 48 C. C. A. 318, 324,

145 F.—35

Judge Lurton said: "If the order made when the receiver in this case was appointed be construed as including claims for services of the kind rendered by these appellants, the order did not vest in the claimants described any absolute right to be paid out of the corpus of the mortgaged property in preference to the mortgagees. If the receiver had acted under that order, and paid these claimants out of income, it would doubtless protect him. But he did not. He had no surplus to so apply. When the claimants sought to have their claims paid out of the corpus of the mortgaged property, and thereby displace fixed liens, the court was free to hear the objections to such a decree, and to decide the matter upon settled principles of equity. Railroad Co. v. Wilson, 138 U. S. 501, 506, 11 Sup. Ct. 405, 34 L. Ed. 1023." In Monsarrat v. Mercantile Trust Co., 109 Fed. 230, 231–232, 48 C. C. A. 328, 329, 330, Judge Lurton said: "The contention that the balance due on this mileage account when a receiver was appointed for the defendant railroad company, became a liability of the receiver by virtue of the order made when the receiver was appointed is unsound. That order was the usual order made in such cases, directing the receiver to pay labor, supply, and material claims, and 'traffic or mileage balances,' which had accrued within six months. Conceding that the order included the balance due on this mileage account. still it does not follow that the claim became thereby a receiver's debt. In the case of Gregg v. Trust Co. (a case against the same receiver, and decided at this term) 109 Fed. 220, 48 C. C. A. 318, we had occasion to pass upon the legal effect of that order, it being there contended that every claim within the terms of that order was thereby preferred over the mortgagees in the corpus of the mortgaged estate. We then held that, while the receiver would have been protected if he had paid out of the earnings of the receivership the claims embraced within the order, yet the order did not vest in any of the claimants an absolute right of payment out of the corpus of the mortgaged estate in preference to the mortgagees. and that if, in default of income out of which the receiver might comply with the order, creditors should seek to displace mortgages resting upon the corpus of the railroad, the mortgagees were entitled to be heard. The case of Railroad Co. v. Wilson, 138 U. S. 501. 506, 11 Sup. Ct. 405, 34 L. Ed. 1023, was cited as an express authority. If this was a right conclusion, it clearly follows that such an order did not have the effect of converting debts of the railroad company into debts of the receiver."

In this case, the order for the receiver to pay from the earnings was made at a time when the bondholders were not represented nor in court. Atlantic Trust Co. v. Dana, 128 Fed. 209, 225–230, 62 C. C. A. 657. This fact would not be material unless there were net earnings of the receivership. In this court the view prevails that proof of diversion is necessary. In Illinois Trust & Savings Bank v. Doud, 105 Fed. 123, 131, 132, 148, 44 C. C. A. 389, 397, 398, 414, 52 L. R. A. 481, Judge Sanborn said: "It is the diversion of the income of the mortgaged property from these claims, which have a superior equity to the claim of the bondholders, that forms one of the grounds of the preferential lien which is vouchsafed to them. But it is only when the income is diverted from the payment of these claims which have a higher equity to the payment of those which stand upon a lower plane that any equity arises in favor of any one on account of diversion. In Fosdick v. Schell, 90 U. S. 235, 253, 254, 25 L. Ed. 339, Chief Justice Waite said that, if the officers of the company 'give to one class of creditors that which properly belongs to another, the court may, upon an adjustment of the accounts. so use the income which comes into its own hands as, if practicable, to restore the parties to their original equitable rights. * * * Whatever is done, therefore, must be with a view to a restoration by the mortgage creditors of that which they have thus inequitably detained. It follows that, if there has been in reality no diversion, there can be no restoration, and that the amount of restoration should be made to depend upon the amount of the diversion.' Burnham v. Bowen, 111 U. S. 776, 4 Sup. Ct. 675, 28 L. Ed. 596; Union Trust Co. v. Illinois M. R. Co., 117 U. S. 434, 6 Sup. Ct. 809, 29 L. Ed. 963; Wood v. Safe Deposit Co., 128 U. S. 416, 420, 421, 9 Sup. Ct. 131, 32 L. Ed. 472. * * * When a careful examination and analysis of the facts and opinions in all the cases in the Supreme Court upon the subject of

preferential claims in suits to foreclose mortgages of quasi public corporations is made, and dicta are distinguished from adjudications, the decisions of that court will be found to sustain these propositions: A mortgagee of the property, acquired and to be acquired, and of the income of a quasi public corporation, such as a railroad company, obtains a lien upon the net income of the company after the current expenses of operation incurred in the ordinary course of business are paid, and impliedly agrees that the gross income shall be first applied to the payment of these current expenses, before the net income to which he is entitled arises. A court of equity, engaged in administering mortgaged railroad property under a receivership in a foreclosure suit, may prefer unpaid claims for current expenses of the ordinary operation of the railroad, incurred within a limited time before the receivership, to a prior mortgage lien, in the distribution of the income or of the proceeds of the mortgaged property. If such a mortgagor diverts the current income from the payment of current expenses to the payment of interest on the mortgage debt, or the improvement of the mortgaged property, so that current expenses remain unpaid when a receiver is appointed, the court may, out of the income accruing during the receivership, restore to the unpaid claims for current expenses the amount so diverted. But if there has been no diversion there can be no restoration, and the amount of the restoration cannot exceed the amount of the diversion." In Kansas Loan & Trust Co. v. Electric Ry. & Light Co. (C. C.) 108 Fed. 702, it was, as stated in the syllabus, decided: "The right of one furnishing supplies to an insolvent railroad company to a preference over the mortgagee is dependent on the fact that there has been a diversion of the net earnings of the mortgaged property over and above the necessary expenditures for operation, and that such diversion has inured to the benefit of the mortgagee, and the burden rests upon the claimant of such preference to establish such facts." Judge Philips, among other things, said: "This cause has been submitted to the court on exceptions filed to the special master's report allowing the claim of the intervener as a preferred claim, to be paid out of the proceeds of the sale of the mortgaged premises prior to the claim of the mortgagee thereon. The master's report, as submitted to the court, with the other papers in the case, presents the matters in controversy in such shape that it is impossible for the court to intelligently understand and pass upon the matters in dispute. As the intervener's right to a preferential claim is dependent upon the fact that there has been a diversion of the net earnings of the mortgaged property over and above the necessary expenitures for operation and that such diversion has inured to the benefit of the mortgagees (Bank v. Doud, 105 Fed. 123, 44 C. C. A. 389, 52 L. R. A. 481), the burden of proof rests upon the intervener to establish this fact. If the net earnings of the operation of the railroad over and above the expenses of operating were in fact diverted into improvements of the mortgaged property, and for its betterment, thereby enhancing the value of the mortgagee's security, to enable the court to determine such fact the master's report should contain a summary of the evidence, showing not only the fact of diversion, but approximately the amount thereof; and if it is claimed that such diversion inured to the benefit of the mortgagee in the way of improvements of the property, or in paying interest on the mortgage debt, or dividends and the like, the master should report and show by the evidence before him into what property the money diverted went, so that the court can see from the facts found whether it went into improvements of the property or its betterment. In other words, the facts found should show what money went in a particular direction, and in what it was invested, so that the court can see from the facts found whether or not the mortgagee received a benefit from the diversion, so as to postpone its lien to that of the claim of the intervener."

These cases establish the rule in this circuit, which is binding upon the master, even if he entertained any doubt upon the subject. However, as an original question, it may be said that, while it has been held that the corpus can be charged with the claim for operating expenses in the absence of a diversion, yet the well-considered cases are to the contrary. Probably the most satisfactory and thorough reviews in the books are Judge Lurton's opinions in a series of cases in the Circuit Court of Appeals for the Sixth Circuit.

In International Trust Co. v. T. B. Townsend Co., 95 Fed. 850, 860, 37 C. C. A. 396, 406, the syllabus thus clearly states the decision: "The doctrine announced in Fosdick v. Schall, 99 U. S. 235, 25 L. Ed. 339, and the cases following it, is that the current income of a railroad is primarily applicable to the payment of its operating expenses, including 'proper equipment and necessary repairs, and that such expenses are an equitable charge on the income earned during the receivership, though incurred previously by the company, within such reasonable time as shall be fixed by the court, and without regard to whether or not income has been diverted; but the right to such preference extends to income only, and the rule does not authorize a court to displace liens on the corpus of the property in favor of supply creditors, except where, and to the extent that, income which should in equity have been applied to the payment of their claims has been diverted for the benefit of the bondholders, either by the payment of interest therefrom, the purchase of property, or in making permanent improvements on the property; and where there has been no such diversion, either before or during the receivership, and there are no surplus earnings of the receivership, a supply creditor of the company is not entitled to payment from the proceeds of the road, when sold, in preference to the mortgagees." Judge Lurton made a thorough review of the cases, and among other things said: "But if there has been no diversion of the current income, either before or after the appointment of a receiver, and no 'surplus income' during the receivership, out of which unpaid debts of the income can be paid, upon what theory can the proceeds of a mortgage foreclosure sale be applied to the payment of such debts against the objection of mortgage creditors? If nothing has been diverted from the 'current debt fund,' if there has been no augmentation of the fund applicable primarily to the satisfaction of the mortgage creditors, is there any just or equitable reason for requiring a restoration where nothing has been improperly received?. We think in such cases the court has no power to displace contract rights, and neither Fosdick v. Schall nor any of the cases which have followed it afford any sufficient authority, when rightly understood, in opposition to this view. These 'debts of the income' are an 'equitable charge' only upon the 'current income' of the mortgaged railroad. If such debts remain unpaid when the railroad passes into the possession of a court of equity, this 'equitable charge' is continued, and attaches to the 'surplus income' arising under the receivership. If this surplus income is not applied to the payment of the debts to which it is primarily devoted, but is expended for the benefit of the mortgagee, as in payment of interest, or in the purchase of property which passes under the mortgage, or in betterments of the railroad itself, an equity arises, as a consequence of such diversion, which will justify a court of equity in requiring the mortgagees to restore to the income that which has been taken away. The power of the court to displace mortgage liens in favor of such unsecured debts of the mortgagor depends upon the fact that the current income, either before or after the receivership, has been diverted to the benefit of the displaced mortgage, and the extent to which the corpus of the mortgaged property can be called upon to pay such debts of the income is limited by the amount of the diversion."

In Rhode Island Locomotive Works v. Continental Trust Company, 108 Fed. 5, 7–9, 47 C. C. A. 147, 149–151, there was another thorough review of the question by Judge Lurton, and among other things he said: "If the appellant is to obtain any relief, it must show, first, that the demand here presented is not a debt created upon the personal credit of the company, but a current operating expense incurred to maintain the property as a going concern, and its railroad in condition to be used with reasonable safety for the transportation of persons and property, and with the expectation of the parties that it was to be met out of the current receipts of the company; and, second, that there are net or current earnings now applicable to the payment of such debts of the income, or that there has been a diversion of the current earnings, either before or since the receivership, which the mortgagees should equitably restore. International Trust Co. v. T. B. Townsend Brick & Contracting Co., 37 C. C. A. 396, 95 Fed. 850; Central Trust Co. v. East Tennessee, V. & G. R. Co., 26 C. C. A. 30, 80 Fed. 624; Virginia & A. Coal Co. v. Central R. & Banking Co., 170 U. S. 365, 18 Sup. Ct. 657, 42 L. Ed. 1068; Southern

Ry. Co. v. Carnegie Steel Co., 176 U. S. 257, 285, 20 Sup. Ct. 347, 44 L. Ed. 458. * * * If the demand of the appellant is to be paid at all, it must be paid out of the proceeds of the sale of the mortgaged property of the railroad company at the expense of the mortgagees. But before this can be done it must be made to appear that there has been a diversion of current earnings, by which this complainant has been deprived of his equitable rights, and that the mortgagees should equitably restore to the fund liable to the payment of debts of the income the fund thus diverted. * * * There is nothing in Southern Ry. Co. v. Carnegie Steel Co., cited heretofore, which casts any doubt upon this restoration doctrine as declared in Fosdick v. Schall, 99 U. S. 235, 25 L. Ed. 339, Burnham v. Bowen, 111 U. S. 776, 783, 4 Sup. Ct. 675, 28 L. Ed. 596, and in St. Louis, A. & T. H. R. Co. v. Cleveland, C., C. & I. R. Co., 125 U. S. 658, 673, 8 Sup. Ct. 1011, 31 L. Ed. 832. Upon the contrary, the decree in that case was predicated upon the fact that there had been a diversion of income 'in paying interest, sinking fund, and contract debts, and for construction and equipment, which were all for the benefit of mortgage creditors, and which, to the extent necessary, should have been applied in payment of preferential claims, including those of the Carnegie Company. 176 U. S. 294, 295, 20 Sup. Ct. 362, 44 L. Ed. 474."

In Gregg v. Mercantile Trust Co., 109 Fed. 220, 227–229, 48 C. C. A. 318, 325–327, it was said: "This court in International Trust Co. v. T. B. Townsend Brick & Contracting Co., 37 C. C. A. 396, 95 Fed. 850, and in Rhode Island Locomotive Works v. Continental Trust Co. (decided November, 1900) 108 Fed. 5, 47 C. C. A. 147, after a full review of all the decisions of the Supreme Court in respect to the power and authority of a court of equity to provide for the payment of labor and supply claims in preference to mortgagees, reached the conculsion that preference could be given to such claims only out of the income of the mortgaged railroad, and that mortgages upon the corpus could only be displaced by such creditors when it was shown that there had been a diversion of the income, either before or after the receivership, by which the mortgagees had profited. In Rhode Island Locomotive Works v. Continental Trust Co. we endeavored to formulate from the decisions of the Supreme Court the principle upon which unsecured creditors might be preferred. Speaking of the claim seeking a preference in that case, we said: 'If the appellant is to obtain any relief, it must show, first, that the demand here presented is not a debt created upon the personal credit of the company, but a current operating expense, incurred to maintain the property as a going concern, and its railroad in condition to be used with reasonable safety for the transportation of persons and property, and with the expectation of the parties that it was to be met out of the current receipts of the company; and, second, that there are net or current earnings now applicable to the payment of such debts of the income, or that there has been a diversion of the current earnings, either before or since the receivership. which the mortgagees should equitably restore. International Trust Co. v. T. B. Townsend Brick & Contracting Co., 37 C. C. A. 396, 95 Fed. 850; Central Trust Co. v. East Tennessee, V. & G. R. Co., 26 C. C. A. 30, 80 Fed. 624; Virginia & A. Coal Co. v. Central Railroad & Banking Co., 170 U. S. 365, 18 Sup. Ct. 657, 42 L. Ed. 1068; Southern Ry. Co. v. Carnegie Steel Co.. 176 U. S. 257, 285, 20 Sup. Ct. 347, 44 L. Ed. 458.' The ground upon which this doctrine of the primary appropriation of income to the payment of current operating expenses rests is that the mortgagee impliedly consents. This implication of consent arises from the fact that a railroad mortgage is a very peculiar kind of property. Looking to the long time of such mortgages, the fact that the mortgagor is expected to remain in possession until default, that the value of the property is largely dependent upon its continued operation, and that the preservation of the franchises of such companies depends upon their continual exercise, it is not unreasonable assumption that 'every railroad mortgagee, in accepting his security, impliedly agrees that the current debts made in the ordinary course of business shall be paid from the current receipts before he has any claim upon the income.' Fosdick v. Schall, supra. The displacement of mortgage liens cannot be justified upon any line of reasoning which assumes that one class of creditors may be deprived of the benefits of their contract liens for the benefit of another upon the ground that the public interests are

thereby subserved by the maintenance of a railway for the public convenience. Such a position antagonizes the constitutional principle that private property shall not be taken for the public benefit without compensation. The public character of such companies is only considered as one of the factors in arriving at the conclusion that the mortgagee in the income contracts only in respect to net income. But, if income alone is applicable to the payment of such operating expenses, how has it come about that in many instances such creditors have been paid out of the corpus of mortgaged property? The ground upon which a mortgage upon the corpus may be displaced is most logically stated by Chief Justice Waite in Fosdick v. Schall in these words: 'The power rests upon the fact that in the administration of the affairs of the company the mortgage creditors have got possession of that which in equity belonged to the whole or part of the general creditors. Whatever is done, therefore, must be with a view to the restoration by the mortgage creditors of that which they have thus inequitably obtained. It follows that, if there has been in reality no diversion, there can be no restoration, and that the amount of restoration should be made to depend upon the amount of diversion.' The fact that such claims seem to have been paid in Miltenberger v. Railroad Co., 106 U. S. 286, 1 Sup. Ct. 140, 27 L. Ed. 117, and that Justice Blatchford does not refer to or discuss the doctrine of diversion of income, has been regarded by some of the Circuit Courts and by some of the Circuit Court of Appeal as justifying the displacement of mortgage liens independently of any diversion of income; and counsel in the cases at bar have urged that evidence of a diversion of income is no longer necessary. We cannot give that consequence to that case in view of the restatement of the diversion doctrine in the later cases of Burnham v. Bowen, 111 U. S. 776, 4 Sup. Ct. 675, 28 L. Ed. 596; and St. Louis, A. & T. H. R. Co. v. Cleveland, C., C. & I. R. Co., 125 U. S. 658, 673, 8 Sup. Ct. 1011, 31 L. Ed. 832. In St. Louis, A. & T. H. R. Co. v. Cleveland, C., C. & I. R. Co., last cited, the claimant was denied payment out of the proceeds of sale of the mortgaged property because no diversion of income had been shown. Touching the necessity of proof of such diversion, the court said: 'There are cases, it is true, where, owing to special circumstances, an equity arises in favor of certain classes of creditors of an insolvent railroad corporation otherwise unsecured, by which they are entitled to outrank in priority of payment, even upon the distribution of the proceeds of a sale of the body of the property, those who are secured by prior mortgage liens. Illustrations and instances of these cases are to be found in Fosdick v. Schall, 99 U. S. 235, 25 L. Ed. 339; Miltenberger v. Railroad Co., 106 U. S. 286, 1 Sup. Ct. 140, 27 L. Ed. 117; Trust Co. v. Souther, 107 U. S. 591, 2 Sup. Ct. 295, 27 L. Ed. 488; Burnham v. Bowen, 111 U. S. 776, 4 Sup. Ct. 675, 28 L. Ed. 596; Union Trust Co. v. Illinois M. R. Co., 117 U. S. 434, 6 Sup. Ct. 809, 29 L. Ed. 963; Dow v. Railroad Co., 124 U. S. 652, 8 Sup. Ct. 673, 31 L. Ed. 565; Sage v. Railroad Co., 125 U. S. 361, 8 Sup. Ct. 887, 31 L. Ed. 694; and Trust Co. v. Morrison, 125 U. S. 591, 8 Sup. Ct. 1004, 31 L. Ed. 825. The rule governing in all these cases was stated by Chief Justice Waite in Burnham v. Bowen, 111 U. S. 776, 783, 4 Sup. Ct. 675, 679, 28 L. Ed. 596, 599, as follows: "That, if current earnings are used for the benefit of mortgage creditors before current expenses are paid, the mortgage security is chargeable in equity with the restoration of the fund which has been thus improperly applied to their use." There has been no departure from this rule in any of the cases cited. It has been adhered to and reaffirmed in them all. Admitting, therefore, that the reasonable rent of the leased line accruing to the petitioner was a proper charge upon the gross income of the Indianapolis & St. Louis Railroad Company, as a part of its current operating expenses, before any net income could arise applicable to the payment of the interest on the mortgage bonds, it must still be shown, to entitle the petitioner to the relief prayed for, that the arrearage due on account thereof has arisen by the diversion and misappropriation of the fund that ought to have been applied to its payment to the use and benefit of the mortgage bondholders. Counsel for the petitioner undertake to do this, and insist that upon the proofs in this case it satisfactorily appears that such a diversion and misappropriation have taken place, to its injury, and to the advantage and benefit of the bondholders claiming the fund in court for dis-

tribution.' In Virginia & A. Coal Co. v. Central Railroad & Banking Co., 170 U. S. 355, 365, 18 Sup. Ct. 657, 42 L. Ed. 1068, and in Southern Ry. Co. v. Carnegie Steel Co., 176 U. S. 257, 293, 20 Sup. Ct. 347, 44 L. Ed. 458, the conclusions were founded upon evidence of diversion of income, the opinions being full and elaborate upon this point. We are aware of the fact that in maintaining the necessity for evidence of diversion of income before allowing solemn mortgage securities to be displaced, we are in disagreement with other courts of appeal for whose judgment we entertain very great respect. Believing, as we do, that we have correctly interpreted the opinions of the Supreme Court, and that the limitations which have been placed upon the preferential character of unsecured operating debts are in accord with settled principles of justice, we shall adhere to the views we entertain until the Supreme Court shall otherwise adjudicate."

In Gregg v. Metropolitan Trust Co., 124 Fed. 721, 722, 59 C. C. A. 637, 638, Judge Lurton again said: "There is no surplus income arising from the operation of the receiver applicable to the payment of this or any other debt, nor is it claimed that there was any diversion of income by the receiver, by which the mortgage creditor profited, upon which to found an equity against the bondholders. Burnham v. Bowen, 111 U. S. 776, 782, 4 Sup. Ct. 675, 28 L. Ed. 596; International Trust Co. v. Townsend Brick Co., 95 Fed. 850, 37 C. C. A. 396, 405. The proceeds of the sale of the mortgaged property are insufficient to pay the mortgage debts, and, if the appellant is to be paid at all, he must be paid at the expense of the mortgage creditors out of the proceeds of the sale of the mortgaged property. Before the mortgage creditors can be displaced in respect of the corpus of the property, it must appear that the current earnings which accrued during the period shortly before the receivership were not applied to the payment of current operating expenses, incurred within the same period, but were used in the permanent improvement of the property mortgaged, or for the payment of the mortgage debt, and that, as a consequence of this misapplication, current expense creditors have been disappointed. This is the well-settled rule in respect of the payment of these so-called preferential debts of the income. Central Trust Co. v. East Tenn., V. & G. Ry. Co., 80 Fed. 624, 26 C. C. A. 30; International Trust Co. v. Townsend Brick Co., 95 Fed. 850, 37 C. C. A. 396; Rhode Island Locomotive Works v. Continental Trust Co., 108 Fed. 5, 47 C. C. A. 147. This was the law as declared in the opinion upon the former appeal and as such is the law of the case. Gregg v. Mercantile Co., 109 Fed. 220, 227, 48 C. C. A. 318."

The Circuit Court of Appeals for the Seventh Circuit took the same view in Niles Tool Works v. Louisville, etc., R. Co., 112 Fed. 561, 563, 50 C. C. A. 390, 392, where Judge Seaman said: "On the facts thus appearing we are of opinion that no foundation exists for priority of the appellant's claim to make it chargeable against the purchasers under the foreclosure decree, and that the order of the circuit court thereupon is sustained by the entire line of authorities. Reversal is sought on the authority of expressions in the early case of Fosdick v. Schall, 99 U. S. 235, 252, 25 L. Ed. 339, upon which, as remarked in the brief on its behalf, the 'appellant anchors its faith;' but the contention ignores the distinctions which are there pointed out as grounds for the preference, and is untenable as well under that decision as it clearly is under the uniform line of later authorities. In Fosdick v. Schall the doctrine is recognized, as fully exemplified in the later cases, that the mortgagee of a railroad company is entitled to the net income only to be applied in payment of interest or principal of the mortgage indebtedness; that there is an implied agreement that the current income shall be first applied to the payment of the necessary operating expenses of the road, and an equitable lien thus arises in favor of debts for current expenses, which will be enforced to displace mortgage liens within reasonable limitations; and as remarked in International Trust Co. v. T. B. Townsend Brick & Contracting Co., 37 C. C. A. 396, 405, 95 Fed. 850, 859, 'the doctrine thus stated is the foundation of the "diversion" or "restoration" doctrine applied in the later cases.' So the rule which was actually applied in Fosdick v. Schall, was in conformity with such doctrine, and, while it is true that remarks in the opinion indicate that 'proper equipment and useful improvements' may be chargeable against the gross earnings, the ground for such possible exception is thus stated: 'If,

for convenience of the moment, something is taken from what may not improperly be called the "current debt fund," and put into that which belongs to the mortgage creditors, it certainly is not equitable for the court, when asked by the mortgagees to take possession of the future income and hold it for their benefit, to require as a condition of such order that what is due from the earnings to the current debt shall be paid by the court from the future current receipts before anything derived from that source goes to the mortgagees.' 99 U. S. 252, 25 L. Ed. 342. This suggestion of contingencies which may enlarge the exception in favor of preference, if consistent with the later decisions, does not support 'the appellant's claim, for the reason that neither of the conditions so indicated appears in the present record."

In Fosdick v. Schall, 99 U. S. 235, 25 L. Ed. 339, 343, Mr. Chief Justice Waite said: "No fixed and inflexible rule can be laid down for the government of the courts in all cases. Each case will necessarily have its own peculiarities, which must, to a greater or less extent influence the chancellor when he comes to act. The power rests upon the fact, that in the administration of the affairs of the company the mortgage creditors have got possession of that which in equity belonged to the whole or a part of the general creditors. Whatever is done, therefore, must be with a view to a restoration by the mortgage creditors of that which they have thus inequitably obtained. It follows that, if there has been in reality no diversion, there can be no restoration, and that the amount of restoration should be made to depend upon the amount of diversion." In Burnham v. Bowen, 111 U. S. 776, 4 Sup. Ct. 675, 679, 28 L. Ed. 596, 599. Mr. Chief Justice Waite said: "We do not now hold, any more than we did in Fosdick v. Schall or Huidekoper v. Locomotive Works, 99 U. S. 260, 25 L. Ed. 345, that the income of a railroad in the hands of a receiver, for the benefit of mortgage creditors who have a lien upon it under their mortgage, can be taken away from them and used to pay the general creditors of the road. All we then decided, and all we now decide, is—that, if current earnings are used for the benefit of mortgage creditors before current expenses are paid, the mortgage security is chargeable in equity with the restoration of the fund which has been thus improperly applied to their use."

In Wood v. Guarantee, etc., Co., 128 U. S. 416, 9 Sup. Ct. 131, 32 L. Ed. 472, 473, Mr. Justice Lamar said: "The argument is unsound. There are several answers to it: First, it overlooks the vital distinction between a debt for construction, and one for operating expenses. The doctrine of Fosdick v. Schall is applicable wholly to the latter class of liabilities. In the case of Cowdrey v. Galveston, H. & H. R. Co., 93 U. S. 352, 23 L. Ed. 950, it was settled that the doctrine does not apply where it is a question of original construction. Secondly, it overlooks the important fact that the doctrine only applies where there is a diversion of the income of a 'going concern' from the purpose to which that income is equitably primarily devoted, viz., the payment of the operating expenses of the concern. In other words, the income must be first devoted to the expenses of producing the income."

In Central Trust Co. v. Chattanooga, etc., R. Co. (C. C.) 69 Fed. 295, 296, Judge Newman said: "The only question discussed on this demurrer has been the right of intervener to priority over the lien of the mortgage debt. So far as that question is concerned, I am clear that the intervener does not make a case by his petition such as makes his claim one to be preferred over the mortgage indebtedness. The case of Cutting v. Railroad Co., 9 C. C. A. 401, 61 Fed. 150, decided by the Circuit Court of Appeals for this circuit, following Fosdick v. Schall, 99 U. S. 235, 25 L. Ed. 339, decides that, in order to make such a claim preferential, it must appear that there was an order of court, at the time the receivers were appointed, providing for its payment, and evidence that the current earnings before or after the appointment of the receiver were diverted to paying interest on the bonded debt."

In Cutting v. Railroad Co., 61 Fed. 150, 156, 9 C. C. A. 401, 408, Judge Pardee said: "The Florida Central & Peninsular Railroad Company further assigns as error that numerous small claims allowed to be due by the defendant, the Tavares, Orlando & Atlantic Railroad Company, for supplies furnished prior to the appointment of the receiver under the bill of foreclosure, were allowed by the court, and ordered to be paid out of the proceeds of th'

corpus of the property. As the court in appointing a receiver made no provision for the payment of such claims, and as there is no evidence in the record tending to show that current earnings, either before or after the receiver was appointed, were diverted to paying unearned interest, or in fact, any interest, upon the bonded debt, we are unable to sanction the order authorizing the payment of said claims from the proceeds of the sale of the property. See Fosdick v. Schall, 99 U. S. 235, 25 L. Ed. 339."

In Hunt v. Memphis Gaslight Co., 95 Tenn. 143, 144, 31 S. W., 1006, 1008, it was said: "Again, the doctrine invoked by the complainants only applies where there is a diversion of the income of a 'going concern' from the purpose of which the income is equitably and primarily devoted, viz., the payment of the operating expenses of the concern." In Coe v. Midland Ry. Co., 31 N. J. Eq. 130, 131, the same view was taken.

In Mersick v. Hartford, etc., R. Co. (Conn.) 55 Atl. 664, 668, 669, 100 Am. St. Rep. 977, after freely quoting from the decisions of the Supreme Court of the United States, Judge Hall said: "From the language quoted from the cases above cited, it would appear that the foundation principle of Fosdick v. Schall, and the other cases referred to, by which a certain preference is given a particular class of unsecured creditors over the mortgagees of a railroad, is an agreement upon the part of such mortgagees, in accepting such security for the payment of the bonds, that current debts, contracted in the ordinary course of the business of the railroad company shall be paid from the current earnings of the railroad before such mortgagees shall have any claim upon such income. It is by virtue of this implied agreement that the current debts, as between the supply creditors and the mortgagees, become a charge in equity upon the continuing income both before and after the appointment of a receiver, and whether or not there has been a previous diversion of the income for the benefit of the mortgagee. But the superior equity springing from such implied agreement, in favor of the current-debt creditors, is in the current income derived from the mortgaged property, and not in the body of the mortgaged property itself. None of the cases above referred to go so far as to imply an agreement upon the part of the mortgagees, in accepting their security, that the body of the mortgaged property may be used to pay the current expenses of operating the railroad. The power of a court of equity to apply the corpus of mortgaged property to the payment of such unsecured claims against the railroad company is always made to rest upon the fact that in some manner the mortgagees have received the benefit of those earnings, which, by their implied agreement, should have been applied to the payment of current expenses. We are not prepared to accept as law the rule which seems to have been adopted in some of the cases cited by counsel—that those who have rendered services, or furnished supplies to keep a railroad in operation, even after the mortgage interest is in arrear, and the bondholders have the right to take possession under their mortgage, are entitled to priority of payment over the mortgagees from the corpus of the mortgaged property, or the proceeds of the sale thereof, when there has been no diversion of the earnings of the railroad to the benefit of the bondholders. Assuming, without deciding, that the doctrine of Fosdick v. Schall is applicable to a street railroad like that of the defendants, how does that effect the rights of these intervening creditors? They are not asking that income in the hands of the receiver be used to pay their claims. There are no earnings of the railroad in his hands. The expense of operating the road during the receivership has exceeded the receipts. To entitle the interveners to payment from the proceeds of the sale of the mortgaged property, it must therefore be shown that there has in some manner been a diversion of the current income for the benefit of the mortgagees. But it does not appear that the mortgagees have received any part of the income of the road which should have been diverted to the payment of these claims, or that the action of the bondholders in taking possession of the road has prevented the payment of these claims from the earnings of the railroad. On the contrary, it appears that no interest has been paid on the bonds from the earnings of the railroad since August 1, 1896, and that since that time the receipts from the road have been inadequate for the payment of the ordinary operating expenses, and that large sums have been borrowed by the company to enable it to meet

its current obligations. There has been no diversion, and there can be no restoration. The claims of the supply creditors and the principal part of the Patterson claim are not debts of the bondholders, but of the railroad company, contracted either upon the credit of the company itself, or upon the credit of its earnings. As there has been no diversion of such earnings for the benefit of the bondholders, there can be no payment of such claims, under the doctrine of Fosdick v. Schall, from the mortgaged property, or the money derived from its sale, until the mortgage debt is satisfied."

Frank Hagerman, for the purchasers.

S. W. Moore and F. H. Wood, for Texarkana & Southern Co., Knott & Swinney, receivers, and Continuous Rail Joint Co.

Austin & Austin, for E. A. Kinsey Co.

H. C. Solomon, for C. & D. Stern and Platte Overton.

A. S. Van Valkenburgh and Frank P. Blair, for Rodger Ballast Car Co.

PHILIPS, District Judge. After the foreclosure sale and the confirmation thereof to the purchaser, various creditors of the mortgagor companies filed intervening petitions to have their respective claims declared preferential in character, to be paid out of the proceeds of the sale under the foreclosure proceedings, or as a lien upon the corpus of the property in the hands of the purchaser. These matters were referred to Shannon C. Douglass, as special master, to take the proofs and report his findings on the facts and the law. To his reports in the cases several of the interveners have filed exceptions, which have been heard by the court. The master's reports are most comprehensive and thorough, exhibiting great care and an intelligent understanding of the issues and the law of the case. His collection and review of the decisions bearing upon the question of preferential claims is a valuable contribution to that branch of judicial literature.

His conclusions on the law are based upon the following propositions, as applied to the character of these claims: (1) To constitute them preferential over the mortgage, which covered not only the corpus of the railroad property of every kind and description, but also the net income after deducting current operating expenses, the debts must have been contracted upon the faith of being paid from such current income, and not created for construction or ordinary equipment. (2) Where there is no proof showing a diversion of such current income to the use or benefit of the mortgagee, and there is a deficit of the net income arising from the operation of the road in the usual business-like way, and the property under foreclosure sale brings less than the mortgage debts, no equity exists in favor of such general creditors over the mortgagee, entitling them to be recompensed out of the purchase money, or to subject the corpus of the property in the hands of the purchaser to the payment of such debts. The master further held that, to entitle the interveners to the enforcement of their alleged preferential claims, it devolved upon them to show by evidence that there had been a diversion to the benefit of the mortgagee of net earnings after deducting such current expenses.

As a general proposition, I understand this to be a correct exposition of the law as applied in this jurisdiction. Illinois Trust & Savings

Bank v. Doud et al., 105 Fed. 123, 44 C. C. A. 389, 52 L. R. A. 481; Atlantic Trust Co. et al. v. Dana et al., 128 Fed. 209, 62 C. C. A. 657; Kansas Loan & Trust Co. v. Electric Railway Co. (C. C.) 108 Fed. 702. This ruling is supported by both the weight of authority and reason. Rhode Island Locomotive Works v. Continental Trust Co., 108 Fed. 5, 47 C. C. A. 147; Lackawanna Iron & Coal Co. v. Farmers' Loan & Trust Co., 176 U. S. 298, 20 Sup. Ct. 363, 44 L. Ed. 475; International Trust Co. v. Townsend Brick & C. Co., 95 Fed. 850, 57 C. C. A. 396; Gregg v. Mercantile Trust Co., 109 Fed. 220, 48 C. C. A. 318; Gregg v. Metropolitan Trust Co., 124 Fed. 721, 59 C. C. A. 637, affirmed in 197 U. S. 183, 25 Sup. Ct. 415, 49 L. Ed. 717; Niles Tool Works Co. v. Louisville, N. A. & C. Ry. Co., 112 Fed. 561, 50 C. C. A. 390; Wood v. Guaranty Trust Co., 128 U. S. 416, 9 Sup. Ct. 131, 32 L. Ed. 472; Cutting v. Tavares, O. & A. R. Co., 61 Fed. 150, 156, 9 C. C. A. 401; Hunt v. Memphis Gaslight Co., 95 Tenn. 143, 144, 31 S. W. 1006; Mersick v. Hartford, etc., Ry. Co. (Conn.) 55 Atl. 664, 668, 669, 100 Am. St. Rep. 977.

It may be conceded that there are expressions in opinions of the Justices of the Supreme Court that certain exceptions should be made, under special circumstances, to the general rule requiring proof of such diversion. It may also be conceded that exceptions at times have been, and doubtless should have been, made, ex necessitate, in cases of imperious business necessities, such, for instance, as the payment of balances on traffic arrangements between the bankrupt and another road, to prevent disruption of the traffic, to the serious detriment of operating the business under the receivership; also, in case of seizure under prior attachment or execution against the bankrupt road, where good judgment would authorize the court to direct the payment of the lien, or where the necessity of continuing a supply contract is supreme, and its continuance should be conditioned upon paying antecedent claims under the contract, and the like. But no such contingency or administrative policy is presented in the instance of any claim in this record.

There are some other settled rules of law applicable to nearly all of the intervening claims which may here be stated:

(1) The fact that the court, in the order appointing the receiver, may have directed that preferential claims for supplies and materials be paid out of the proceeds of the sale or the corpus of the property in the hands of the purchaser does not control the right of the purchaser to contest such claims on the grounds that they are subordinate in right to that of the prior mortgagee. Louisville Railroad Co. v. Wilson, 138 U. S. 501, 11 Sup. Ct. 405, 34 L. Ed. 1023; Gregg v. Mercantile Trust Co., supra; Monsarrat v. Mercantile Trust Co., 109 Fed. 230, 48 C. C. A. 328.

(2) In some of the claims counsel for interveners have attempted to show diversions prior to the creation of the debts sought to be enforced as an equitable lien. This court in Kansas Loan & Trust Co. v. Electric Railway, etc., Co. 108 Fed. 703, said:

"This intervener has nothing to do with the earnings of the road or their diversion by the road prior to the creation of its debt. The creditor can only

concern himself about diversions of the current earnings after the creation of his debt."

In Central Trust Co. v. East Tennessee Ry. Co., 80 Fed. 624, 626, 26 C. C. A. 30, Judge Lurton said:

"Prior to the period covered by the maturity of appellants' claims, there was a surplus of gross earnings over all operating expenses; but it cannot be contended that the company was under any obligation to future creditors to accumulate a surplus in the income to meet possible deficiencies in the income to meet future income debts, or that it was improper to apply such surplus in payment of interest."

(3) Stress is placed in argument in respect of expenditures for machinery, repairs, and improvements made on what is known as the "Quincy Division," operated by the Eastern road under a contract of lease; that the leased line had become so out of repair by reason of original imperfect construction and wear and tear that in the year preceding the appointment of the receivers in the original suit the railroad commissioners of the state had pronounced it unsafe for public use, and directed that the roadbed and some of its bridges be placed in necessary repair within a given time. Further stress is laid upon recitals contained in a petition by the receivers to the court, asking permission to issue receiver's certificates to raise money for making such repairs, etc.; the argument based thereon being that such material and work were essential to keep the road a going concern, and therefore the debts created for the machinery, etc., furnished to aid in thus improving the condition of the road should be held preferential, irrespective of whether there was any diversion of net income. In the first place, it is to be kept in mind that when all this occurred the mortgagee was not in court. It did not become a party to the proceedings in which the receivers were appointed until December 1, 1901, when it appeared and filed its cross-bill. Any statements made by the receivers in said petition, and any adoption of the expressions of the receivers in the order of court, were, as to the mortgagee not a party to the proceeding, entirely ex parte, and could not be, as against it, evidence of the facts recited. Aside from this, the law is, as declared by the Court of Appeals of this circuit in Atlantic Trust Co. v. Dana, 128 Fed. 209, 62 C. C. A. 657, that the right of the intervener as against the mortgage lienor to have such claims declared preferential, to be enforced upon the corpus of the property in the hands of the purchaser under the foreclosure sale, is to be regarded as a debt not authorized or sanctioned by the mortgagee.

(4) Nor can the fact that the mortgagee, after its right accrued to enter as for condition broken, failed to exercise it, be construed into an equitable estoppel on the ground of its acquiescence in the expenditures made as equitable liens created by the mortgagor, or the receivers appointed by the court when the first mortgagee was not a party thereto. The only effect of the nonaction of such prior lienor is to preclude it from laying any claim to the current income accruing prior to its cross-complaint, which may have been used or diverted, to which such lienor might have asserted claim. Atlantic Trust Co. et al. v. Dana, supra; Mersick v. Hartford, etc., Ry. Co., supra.

(5) Further, the law is that, although the equipments and repairs augmented the mortgage security, it does not affect the question of the right of the interveners to the asserted preferential lien. Rhode Island Locomotive Works v. Continental Trust Co., supra; International Trust Co. v. Townsend Brick & C. Co., 95 Fed. 850, 37 C. C. A. 396; Illinois Trust Co. v. Doud, 105 Fed. 148, 44 C. C. A. 389, 52 L. R. A. 481.

The master has found as a fact from the evidence before him that there was no diversion of the net income derived by the receivers from the operation of the road to the use of the mortgagee, for the palpable reason that after the most liberal allowances for all claimed diversions for improvements to which an equitable lien could attach there was no surplus income. The law is that the master's report upon matters of fact is deemed to be true where no exceptions are properly taken thereto. And even where an exception is taken, the conclusions of the master on questions of fact, on conflicting evidence, if any, are presumptively correct, and will be adhered to by the court on review unless it appears to be palpably wrong by the most persuasive weight of evidence. Growing out of these rules in such procedure, exceptions, when taken, must not be to the general result, as such would be but in the nature of a general demurrer. The exceptions must be specific, pointing out the particular errors relied upon, and where they are based upon particular evidence contradicting conclusions of the master they should refer to the evidence in the record where the same may be found, and not leave the court to grope through voluminous records of testimony, as in this case, running into thousands of pages, to find, as best it may, where the evidence relied on may be found. Chief Justice Marshall, in the early case of Harding v. Handy, 11 Wheat. (U. S.) 103-127, 6 L. Ed. 429, said:

"It may be observed, generally, that it is not the province of a court to investigate items of an account. The report of the master is received as true when no exception is taken, and the exceptions are to be regarded so far only as they are supported by the special statements of the master, or by evidence, which ought to be brought before the court by a reference to the particular testimony on which the exceptor relies. Were it otherwise, were the court to look into the immense mass of testimony laid before the commissioner, the reference to him would be of little avail. Such testimony, indeed, need not be reported further than it is relied on to support, explain, or oppose a particular exception."

Mr. Justice Clifford in Greene v. Bishop, 1 Cliff. 186, Fed. Cas. No. 5,763, after adverting to the above statement of Chief Justice Marshall, said:

"But the evidence ought to be brought before the court by reference to the particular testimony on which the excepting party relies."

Speaking of the exception he said:

"It merely alleges that the finding of the master is erroneous and unsatisfactory, without attempting or pretending to specify any particulars in which the error consists. * * * and omits altogether to refer to any portion of the testimony to support the allegation."

In Jaffrey v. Brown (C. C.) 29 Fed. 476, 479, the court said:

"The exceptions are to be regarded so far only as they are supported by the special statements of the master, or by evidence which ought to be brought before the court by a reference to the particular testimony."

In Jones v. Lamar (C. C.) 39 Fed. 585-587, the court said:

"Solicitors for the complainants say that they are unwilling to rely solely upon the evidence referred to by the master as the basis of his findings, and since they have specified nothing else, and since the court, under the rule in Harding v. Handy, supra, will not consider testimony in support of the exceptions not referred to in the report of the master, or brought to its attention by appropriate reference in the exceptions, exceptors are unable to proceed."

See, also, Farrar v. Bernheim, 74 Fed. 435-438, 20 C. C. A. 496.

In .fact the exceptions in these cases do not even directly charge that the master has improperly reported the facts. But again and again, with unusual reiteration, it is simply charged that the master erred in finding that there was no net income, or that there was no diversion, or that the claim was not preferential, and the like, and that he should have found otherwise, without claiming that his finding is not supported by evidence; and by pointing out where the court will find the particular fact or facts relied on. In such condition of the record the court would be justified in accepting the master's findings of the facts as correct. Nevertheless, the court, in certain instances, has had recourse to the record, and read the evidence, although it has occasioned great inconvenience and labor, bearing upon particular questions of fact, to determine whether they justified a different finding from that of the master.

### Claim of Receivers of the Gulf Company against the Eastern Company.

The receivers of the Gulf Company, on December 30, 1899, recovered a judgment against the Eastern Company for $24,738.78, including interest, upon an account against the Eastern Company accruing prior to the receivership. As found by the master, the greater portion of this claim consisted of the proportionate part of joint expenses paid by the Gulf Company. The Eastern, Northern, Omaha, and Gulf Companies were operated as one system. The expenses of their general offices and other departments were, in the first instance, paid by the Gulf Company, and by a system of bookkeeping a charge was made upon some basis against each company which was a part of the system. Other items were for repairs to cars and locomotives and car supplies, the principal items being for rental of locomotives. There was also a claim, not included in the judgment, for $118.89 for stationery and telegraph bills due from the Eastern Company to the Gulf Company. The court is strongly inclined to the opinion that, under the facts found by the master touching the relations between the Gulf Company and the Eastern Company, the method of their management and operation, under the master mind of Mr. Stilwell, making them one system in fact, in connection with the manner of the bookkeeping and the adjustment of accounts at stated periods, the carrying of balances and charging the same to a general account,

the Gulf Company was and is in no position to claim that the credits were extended upon the faith of the application to their payment of the current earnings of the Eastern Company, and therefore they are wanting in the first quality of a preferential claim. The following authorities bear upon the law of the case: Thomas v. Western Car Co., 149 U. S. 95–112, 13 Sup. Ct. 824, 37 L. Ed. 663; Penn v. Calhoun, 121 U. S. 251, 7 Sup. Ct. 906, 30 L. Ed. 915; United States Trust Co. v. Western Contract Co., 81 Fed. 454, 26 C. C. A. 472; Morgan's Louisiana & Texas Railroad, etc., Co. v. Texas Cent. R. Co., 137 U. S. 171, 11 Sup. Ct. 61, 34 L. Ed. 625.

The court approves the findings of the master that the items of the judgment for the rental of the locomotives and expenses advanced in maintaining a joint system of officers and offices are not preferential, as shown by the following authorities: Fosdick v. Schall, 99 U. S. 235, 25 L. Ed. 339; Kneeland v. American Loan & Trust Co., 136 U. S. 89, 10 Sup. Ct. 950, 34 L. Ed. 379; Thomas v. Western Car Co., supra; Rhode Island Locomotive Works v. Continental Trust Co., supra; Morgan's Louisiana & Texas R., etc., Co. v. Texas Cent. R. Co., supra; Contracting & Building Co. v. Continental Trust Co., 108 Fed. 1, 4, 47 C. C. A. 143.

The court also approves the findings of the master that the claim of intervener touching the matter of the payment of interest prior to the appointment of the receivers did not constitute a diversion, and was not preferential in its character.

The matter of purchase of ballast cars and ballasting and work done on the Quincy Division will be more particularly discussed when we come to the consideration of the claim of the Rodger Ballast Car Company. It is sufficient here to say that the contention of counsel for the Gulf Company that this purchase and work should be regarded as of the nature of original capital, or a construction which should be accounted for, although not paid for by the Eastern Company, should not be recognized. The analysis made by the master of the whole evidence touching the issue of any actual surplus of net earnings clearly demonstrates that, considering all outlays which might have been characterized as diversions, there was a large deficit of net income after deducting the operating expenses. The evidence furthermore shows that in order to keep the road a going concern the bondholders made large advances to its operators. It results that the exceptions are overruled.

The Claim of the Texarkana & Southern Company; also Claim of Knott & Swinney, Receivers of the Kansas City Suburban Belt Railway Company.

The court perceives nothing worthy of review arising on the exceptions in this case, and the findings of the master are approved, and the exceptions are overruled.

Claim of the Rodger Ballast Car Company.

This claim is predicated of the purchase price of 32 ballast cars, one plow car, and for freight charges thereon, shipped to the Eastern

Company, and accepted in November, 1899. This claim was urged before the master in the first instance upon the theory that they were preferential in their character, and should be allowed regardless of the question of fact as to whether or not there was any diversion of net income under the receivers. The intervener, concluding ultimately to attempt to show a diversion, introduced in evidence books of account of the Eastern Company, and examined its auditor and chief engineer. The result of the book account showed that the expenses of operation of the road under the receivership from January 2, 1900, and including June 23, 1903, amounted to $1,313,538.31, and that the total earnings were $1,122,281.63, leaving a deficit of $191,256.68. The only oral testimony introduced by the intervener on this branch of the case was that of Collins, the chief engineer, and Kendrick, the auditor of the receivers. In the first place, the intervener's debt having been contracted prior to the intervention of the mortgagee by cross-bill, and the work on the Quincy Division, where the supplies were used, having been furnished under contract of purchase prior to said intervention, how stands this claim? The ballast cars purchased were merely for facilitating the work of hauling and distributing the ballast along the railroad for improving the track. The cars were not the ballast itself, essential to placing the track in proper and suitable condition for successful operation. They were mere vehicles—cars conveniently constructed—for hauling ballast from one point to another, whereby it may be conceded that the work of such ballasting was facilitated or expedited. In this respect how does it differ, as affecting the right of preference over the mortgage, from an engine or other car bought to assist in the better operation of the railroad work, whereby its business could be better done and its income augmented? Debts contracted for such adjuncts and equipments to railroads do not necessarily constitute a claim preferential to that of the mortgage upon the corpus of the property or the current income covered by the mortgage. Lackawanna Iron & Coal Co. v. Farmers' Loan & Trust Co., 176 U. S. 298, 20 Sup. Ct. 363, 44 L. Ed. 475; Southern Railway Co. v. Carnegie Steel Co., 176 U. S. 257, 20 Sup. Ct. 347, 44 L. Ed. 458; Rhode Island Locomotive Works v. Continental Trust Co., supra; Illinois Trust & Savings Bank v. Doud, supra. As already shown, the fact that the equipments augmented the security does not alter the case. Rhode Island Locomotive Works v. Trust Co., supra; International Trust Co. v. Townsend Brick & C. Co., supra.

It being conceded that prior to appointment of receivers there was no net income, to give the intervener the relief sought it devolved upon it to show that after the creation of its debt, and during the operation of the road under the receivership, they diverted to the use or benefit of the mortgagee a part of the net income of their earnings in the operation of the road, which in equity should have been applied to the payment of its claim. To meet the result, as shown by the books of the company above stated, objection is made to the item of $51,000 on the credit side of the account of expenditures, which represents the amount of receiver's certificates issued under the authority

of the court. The contention is that the receivers should have charged themselves with the amount realized on such certificates, which is not shown by the debit side of the account. It is suggested by counsel for the purchasing company that from all that appears from the evidence this $51,000 might have been included in the item under the head of earnings "All Other Sources," $83,816.74. As there was no evidence showing the constitutent elements of the "all other sources," the presumption might be indulged that the receivers kept an honest account, and charged themselves with the proceeds of the receiver's certificates, and that without more it ought to be assumed that this is embraced within "all other sources." But, waiving this, deducting the $51,000, there would still remain $141,256.68 of expenditures over earnings.

The next contention of intervener is that the item of credit of $101,-483.52 of expenditures for rentals paid on the lease contract of the Quincy road should be deducted as a diversion. The court can perceive no reason why this contention should obtain. Long prior to the extension of the credit of the Eastern road, the lease contract between it and the Quincy road was made. The rentals paid were in fulfillment of that contract. The lease having been taken over and recognized by the receivers, the contract became obligatory upon them until repudiated. Central Trust Co. v. Continental Trust Co., 86 Fed. 517, 528, 30 C. C. A. 235. In that case the court said: "When a lease of part of a line of railroad has been adopted by the receiver and the court, the rent should be paid as an operating expense." And in Mercantile Trust Co. v. Farmers' Loan & Trust Co., 81 Fed. 254–258, 26 C. C. A. 387, the court said:

"If the court below properly accepted and adopted the leases, the rentals reserved under them became an integral part of the operating expenses of the trust estate in the hands of the receivers, as much as the wages of the hired men, the rent of leased engines or cars, the traffic balances due connecting railroads, or any other ordinary expense of operation."

In no proper legal sense was such rental payment a diversion in favor of the mortgagee.

The master properly found that the repairs of bridges for the maintenance of the Quincy road constituted a part of the rental provided for by the lease, and, as such, they were necessary operating expenses. The credit side of the account shows an item of "equipment notes" $39,362.93. The settled law of this jurisdiction is that such items are classed as operating expenses, and do not constitute diversion in favor of the mortgagee. The oral evidence introduced shows that the ballasting was 33 miles upon the Eastern road and 60 miles on the Quincy Division; one-tenth of which was full ballast, at $1,650 per mile, and nine-tenths was one-half ballast, at $1,000 per mile. It does not appear from the evidence on what particular road this one-tenth of full ballast was applied. In any event, not over one-tenth can be regarded as new construction, and the nine-tenths was merely repair work. The item of charges for work on bridges was on the Quincy Division, and was of the nature of repair work. There were some water tanks destroyed by fire which were rebuilt, and perhaps one

145 F.—36

new one built, and there was $4,050 expended on the construction of a spur road, and other claimed new constructions, amounting in the aggregate to $8,300. These were expended on and in connection with the Quincy branch of the railroad. It is in the first place very questionable as matter of law whether these expenditures, which inured to the benefit of the Quincy Division and not to that of the Eastern Company, covered by the mortgage, could be said to have inured to the benefit of the mortgagee; or, in other words, whether or not the diversion, if any, could be charged to the Eastern Company. In St. Louis, Alton, etc., Railroad Co. v. Cleveland, etc., Railway Co., 125 U. S. 658, 8 Sup. Ct. 1011, 31 L. Ed. 832, where the question was between claims of a preferential character and the bondholders under a second mortgage, the court said:

"It cannot be said that the application of earnings to the payment of the interest on the first mortgage bonds is chargeable to the holders of the second and third mortgage bonds; the latter alone are interested in the fund for distribution. That fund, in the sense of the rule sought to be applied, cannot be said to have been benefited by the payment to other bondholders from the gross earnings applicable to the payment of the rent. The equity of the petitioner, if in fact it exists, is against the holders of the first mortgage bonds, who have actually received the money to which it claims to be equitably entitled. * * * As we have already stated, no equity can arise upon the alleged breach of trust unless the second and third mortgage bondholders participated in it, or have been benefited by it."

The only answer to this is the suggestion that, inasmuch as the Eastern road had an option under the lease contract to purchase the Quincy line, it had an indirect interest in making the betterments on the leased line. This, however, would only be, at the most, prospective and contingent, which was never realized, and in no wise conferred a present benefit on the mortgagee. The bare expectation in no degree augmented the mortgage security.

Independent of these considerations, conceding that certain items of expenditures on the Quincy road should be deducted from the credit side of the account, there would still remain a large deficit in the current earnings under the receivership, arising from operating expenses. Before the intervener can charge the corpus of the property in the hands of the purchaser with the payment of its claim, the burden is upon it to show that but for such diversion there would have been a net surplus of earnings subject to the equitable lien. The law only exacts that the amount of the diversion shall be restored by the mortgagee receiving it for the benefit of those entitled thereto. So that if its restoration still left a large deficit in the net earnings in the operation of the road, there would be no subject-matter upon which the equitable lien could attach. Furthermore, the proof is that the contract of lease, under direction of the court, was surrendered by the receivers, and the property was surrendered to the Quincy Company prior to the decree of foreclosure, and therefore no possible benefit inured to the mortgagee from any improvements made thereon.

It results that the exceptions must be overruled.

## Claim of Continuous Rail Joint Company.

This claim amounts to $2,799.46 for rail joints purchased in November, 1899, by the Eastern Company and used upon its road. Conceding that this was an operating expense contracted upon the faith of the earnings of the company, proof of diversion for the benefit of the mortgagee is essential to the relief. The only evidence thereof, in the first instance, was under the stipulation that the testimony taken in the case of the Rodger Ballast Car Company should be used. Afterwards it was stipulated between counsel as follows:

"That all evidence tending to prove or disprove a diversion, if any, offered by or against any of the intervening petitioners in this case who have filed claims against the Eastern Company, shall be considered as offered in evidence in the matter of this intervening petition, and made a part of the record, subject to such orders as may be made as to costs."

On this state of the record counsel for intervener bases a claim of diversion upon the fact of payment prior to the receivership of rentals on the lease of the Quincy Company, in the form of interest on certain bonds of that company. The master found and held that the theory of liability where there has been no diversion of earnings is that the mortgagee received a benefit in the way of the payment of interest or for the betterment of his property; that the fact that some other road or some other bondholders received such benefit is no reason why the property of the Eastern Company should be charged with the amount of the diversion as against the mortgagees, who received no benefit therefrom. In addition to this, the payment of such interest was a part of the consideration of the rental contract, and, as stated under the foregoing ruling, would be a part of the operating expenses. The master has found that there were at no time any net earnings that were or could have been paid on the interest upon the bonded debt of the Quincy Company, as there were no such net earnings. The master also further found that prior to the receivership no payments on account of lease rentals were made either from the gross or net earnings of the Eastern Company or from its funds; that the same were made by the construction company, and by it charged to the Eastern Company in its unpaid open accounts, heretofore referred to. The total amount actually paid as rentals in the form of interest upon bonds of the Quincy Company was $124,000, although the total indebtedness incurred for the lease rentals was $210,344.68. The loss in operating expenses over earnings prior to the receivership was in excess of $351,000, making $140,191 in excess of all liabilities incurred for lease rentals, and over $227,000 in excess of the amount of interest paid upon the bonds of the Quincy Company. Superadded to this, the master finds the fact to be that prior to the receivership $228,480.11 was advanced in loans of money to the Eastern Company by those interested in marketing its bonds. The analysis of these accounts and the deductions made therefrom by the master demonstrate beyond any question that there were no net earnings applicable to the payment of this claim. This claim originated November 7, 1899. Between that date and the appointment of the receivers there were no payments by the Eastern Company for interest upon

its own or the bonds of the Quincy road, or for lease rentals, or for the benefit of the mortgage bondholders. As already shown in the foregoing part of this opinion, it is a matter of no concern to this intervener what payments were made prior to the origin of its account.

The master has found that the $15,000 claimed by the intervener to have been paid for lease rentals in November, 1899, was not paid by the Eastern Company, but was paid by the construction company, and charged in the open account. Further claim is made by intervener that $15,943.65 was paid for new locomotives in October, November, and December, 1899. The master has found that of this amount $5,990 was paid October 31, 1899, prior to the origin of the intervener's account, $6,500 in notes, and the balance, amounting to $3,643.65, consists of items, $3,000 of which went into equipments, and the $3,643.65 was more than reimbursed by advances in borrowed money, and was far less than the loss in earnings. The sum of $14,054.68, claimed to have been paid in October and November, 1899, to the Pullman Company, was for equipments, and the master has found that this was not paid out of the current earnings, but upon drafts on the construction company. The other items claimed to have been diverted were for equipments, for maintenance, and repairs on the Quincy line. I can find no reason in fact or law for setting aside the findings and conclusions of the master respecting this claim, and the exceptions are therefore overruled.

### Claim of E. A. Kinsey Company.

This claim is for $990. The master has found that this sale was made to the Omaha Company, and credit extended to it, and that in the accounts between the Omaha and the Eastern Companies one-half of this amount was afterwards charged to the Eastern Company, because material to that extent was used by the Eastern Company in 1899 in reconstructing its track. While these roads were run under practically one management, it was a matter of arrangement between the companies after the contract and sale was made. As such, the case falls within the decision in Southern Railway Co. v. Ensign Mfg. Co., 117 Fed. 423, 54 C. C. A. 591. And whether or not this is to be regarded as a contract completed between the claimant and the Omaha Company, there was no evidence introduced on the part of this claimant showing a diversion of any net income in favor of the mortgagee. The claim was therefore rightly rejected by the master, and the exceptions must be overruled.

### Claim of C. & D. Stern.

This claim is for $805 for rent of a building at Quincy, Ill., for November and December, 1899, and January, February, March, April, and May, 1900, and also for 32 wooden boxes sold in November, 1899, for $4.90, and for damages to a broken window 75 cents. The master has found that no proof as to the last two items was offered. The lease was made June 1, 1899, to the Eastern and Omaha Companies for one year, at a rental of $115 per month. During the occu-

pancy of the building the rent was paid upon the basis of 46 per cent. by the Omaha Company and 54 per cent. by the Eastern Company. The rent was all paid up to November 1, 1899, and they vacated the building November 7, 1899, offered the keys to the intervener, who refused to accept them. As there was no actual occupancy of the building after November 7, 1899, the only claim of intervener arises on breach of contract, for which no preferential right could arise. This was expressly so held in the case of Central Trust Co. v. Wabash Railroad Co. (C. C.) 32 Fed. 566, 567. The only basis for preferential claim could be predicated of the seven days of rent in the month of November, amounting to $26.84, which was properly rejected, in the absence of any proof of diversion. This exception is therefore overruled.

### Claim of Platte Overton.

This claim is for $497.60 for ties, lumber, and fence posts furnished the Eastern Company in November, 1899. The other items of the account were paid. The unpaid account in favor of J. C. Duval & Co. the intervener claims was assigned to him. But the master held that the proof of such assignment was not satisfactory. It would be a sufficient answer to this claim to say that it was not filed until the 28th day of August, 1903, long subsequent to the time fixed in the order and decree of court for filing such claims. While the claimant has presented affidavit in explanation of the delay in presenting the claim, it furnishes no excuse in law. Equity favors the diligent. It is of great importance, where parties are undertaking to fix such liens upon the property purchased at foreclosure sale, that such claims should be promptly presented, so that the purchaser may have early knowledge of what claimed burdens there are upon his purchase. Even if this objection were removed, there is an utter failure of any proof of diversion, and the claim was properly rejected. The exception is overruled.

### Claim of Handlan-Buck Manufacturing Company.

This claim is for supplies furnished prior to the appointment of receivers, sold to the Omaha Company upon its order, amounting to $377.75. The master finds that they were necessary for keeping the Omaha Company in good condition, and when used it was as an operating expense. It appears that the claimant filed an intervention in the foreclosure suit against the Omaha Company in the Circuit Court for the Southern District of Iowa for the full amount of this sum, of which $168.51 was allowed as a preferential claim and paid. The balance of the account was disallowed. The court in that cause undertook by its decree to declare that the intervener was entitled to be subrogated to all the rights of the Omaha Company or the receiver thereof against the Eastern Company. So the claim is presented here. $209.28 of these supplies were in fact used by the Eastern Company in the operation of its road. The said decree of the Iowa court, if not extrajudicial, was clearly res inter alios acta, and cannot be recognized as binding in this proceeding. The claim was clearly inad-.

missible as preferential, for the reason that credit was not given upon the faith of the earnings of the Eastern Company, and there is no proof of any diversion. This exception, therefore, is overruled.

### Claim of Simmons Hardware Company.

The claim of Simmons Hardware Company is for $442.36 for hardware supplies sold to the Eastern Company in December, 1899, and used on the road. The claim was rejected for lack of any proof of diversion made by it, and therefore the exception is overruled.

### Claim of Railway Supply Company.

The facts in this case and the law applicable thereto are little different in principle from those presented in the foregoing case of Handlan-Buck Mfg. Co., and for the reasons assigned in the latter case the exceptions herein are overruled.